[No. S046733. July 10, 2006.]

THE PEOPLE, Plaintiff and Respondent, v.
GREGORY SPIROS DEMETRULIAS, Defendant and Appellant.

## Counsel

Joseph Baxter, under appointment by the Supreme Court, for Defendant and Appellant.

Bill Lockyer, Attorney General, Robert R. Anderson, Chief Assistant Attorney General, Gary W. Schons, Assistant Attorney General, William M. Wood and Teresa Torreblanca, Deputy Attorneys General, for Plaintiff and Respondent.

## Opinion

**WERDEGAR, J.**—Gregory Spiros Demetrulias was convicted and sentenced to death for murdering Robert Miller in the commission of a robbery or attempted robbery against Miller. On his automatic appeal, we affirm the judgment in its entirety.

### Factual and Procedural Background

Defendant fatally stabbed Miller in Miller's room on the evening of January 10, 1989. The prosecution maintained he did so while robbing Miller. Defendant at trial admitted killing Miller, but claimed he did so in a struggle Miller initiated when defendant came to collect money Miller owed him.

#### Guilt Phase Evidence

##### Prosecution

The victim, Robert Miller, 56, lived in a second floor room at the Mar Mac Manor, a boardinghouse in Riverside. On January 10, 1989, around 6:45 p.m., he had dinner at the Yum Yum Restaurant, where he was a regular customer. When he paid for his meal, he took from his pocket what, to the cashier, appeared to be several hundred dollars in cash. Bank records showed he had withdrawn $480 in the preceding week and on January 17, 1989, had an account balance of $1,151.

Defendant, then 35 years old, was living with his parents in Riverside. According to the parents, on the day of the crimes defendant drank a large amount of beer, may have been taking prescription drugs, and displayed an angry or hostile attitude. That evening, defendant's mother, at his request, drove him to the Round Up Bar, not far from the Mar Mac Manor. She also gave him $30 or $40. Defendant had been going to the Round Up Bar regularly over the previous month or so, as had the victim, Robert Miller. Defendant got to the Round Up Bar around 7:30 p.m. His speech slightly slurred, he ordered a beer and drank about half. He then slammed his drink on the bar, acting very upset. The bartender asked him to leave; after finishing the beer, defendant did so, stating he was going to get a beer at the Stop-and-Go convenience store next door. Through the bar window, a witness in the bar saw defendant walk back and forth between the bar parking lot and the Stop-and-Go several times over the course of the next hour and a half, drinking. About 9:30 p.m., he walked away.

Robert Hanshaw, a second floor Mar Mac Manor resident like Robert Miller, testified that just before 10:00 p.m. on January 10, 1989, he was awakened by someone running up the stairs. Hanshaw heard someone say, "Give me your wallet," in a loud, demanding voice. About 45 seconds later, Hanshaw heard steps descending the stairs; Miller then came out of his room and announced: "He stabbed me in the heart. He's killed me."

Eric Carson lived on the first floor of the boardinghouse. Sometime between 9:30 and 10:00 p.m., he heard banging and stomping, then someone say in an aggressive voice: "Give me your money. Give me your wallet." Carson went out into the first floor hallway, where he was joined by the building manager, Herb Hamilton. After Hamilton yelled something, Carson saw defendant, who seemed to have something in his hand, hurry down the stairs. Defendant said something, rushed by Carson and Hamilton, and left by the front door. Miller then staggered down the stairs and, saying he had been stabbed in the heart, collapsed by Carson and Hamilton.

Miller died of a seven-inch-deep stab wound to his chest. He had also been stabbed in the face, back, and upper arm. All the wounds were inflicted with a knife that had one sharp and one dull edge. Directly outside Miller's room, investigating officers found such a knife blade, almost eight-inches long, with blood on it. In the kitchen of the Mar Mac Manor, on the first floor, a drawer containing knives and other implements was partially open. Miller's wallet was in a fanny pack on the dresser in his room. No money was in it, but $34.70 in cash was in his pants pocket. The fanny pack also contained papers, including a pawn shop loan receipt, dated December 2, 1988, for $10.

About 4:30 the next morning (January 11, 1989), a police investigator assigned to the Miller homicide encountered defendant walking on a street near the Mar Mac Manor, appearing very intoxicated. Defendant, who resembled a composite sketch based on Carson's observations of the assailant, acted evasively when the investigator approached him. The officer detained and searched defendant. His clothes had apparent bloodstains. In his pockets police found $1,274 in cash, as well as two knives, numerous coins, four .38-caliber cartridges, and a wallet and drug prescription bottle with identification for one Clarence Wissel of Colton.

Police went to Wissel's house, less than a mile away, and found it had been ransacked. Wissel's belongings, some gathered in plastic bags, were in the doorway, on the driveway, and across the street. Wissel, 82, was in a bedroom, bound with a telephone cord and with a heavy dresser placed on top of him. Dried blood was on the walls, as well as on Wissel's head and on a telephone beneath him. In the same room, police found a wallet with defendant's identification and a revolver with the cylinder removed. Beer bottles and a knife were in the kitchen sink, and another knife was on the washing machine. Wissel's dentures were found in a toilet. Wissel had suffered stab wounds to his neck, elbow, and chest, as well as brain injuries, and was comatose when he arrived at the hospital.

In a field about halfway between the Mar Mac Manor and Clarence Wissel's house, investigators found shoe prints the same size as defendant's shoes and matching the Reebok print pattern of the athletic shoes defendant was wearing when arrested. The same prints were found at and around Wissel's house. A woman who lived by the field had heard her neighbor's dogs bark loudly around 10:00 p.m. on January 10, which indicated to her that someone was outside.

*Defense*

The owner of the Mar Mac Manor testified, from her business records, that Miller had paid his $275 rent in cash on January 10, 1989. A woman who was with Eric Carson in his room the night of Miller's killing testified that Carson had described the assailant to her as a Black man. (Defendant is not Black.) A defense investigator testified that Robert Hanshaw had told him he did not hear another person say, "Give me your wallet" or any words to that effect, but heard only Miller say, "He stabbed me." A sample of defendant's blood taken at 10:15 a.m. on January 11, 1989, showed a blood-alcohol level of .04 percent (suggesting a higher level, around .10 percent, three hours

earlier), a therapeutic-range level of diazepam (Valium), and an unknown amount of Lorazepam, also a sedative.

In support of defendant's claim that he knew Miller and had lent him money, Maria de Vries, the owner of the Round Up Bar, testified she had seen defendant and Miller in the bar together on one occasion, but did not remember if they had talked with one another. Contradicting herself, she also testified she had never seen the two in the bar at the same time, or at least did not remember seeing them together. Martha Smith, a bartender, also testified she saw defendant and Miller talking together at the bar one evening. She was uncertain of the date, but thought it was two or three weeks after she had begun working, which was just after Christmas 1988. On rebuttal, the prosecution produced, through de Vries, timesheets for Smith's employment. The earliest was for April 1989, after Miller's death. Smith, however, testified that when she began working at the bar they used a sign-in sheet, instead of individual timesheets, to keep track of shifts worked.

Defendant testified on his own behalf. He admitted felony convictions for burglary in 1976, theft offenses in 1980 and 1983, and robbery and assault with a deadly weapon for the attack on Clarence Wissel in 1989.

According to defendant, he and Miller met while both were drinking at the Round Up Bar in December 1988. They talked in the bar a few times after that. On January 6 or 7, 1989, defendant lent Miller $40, which Miller promised to repay at the bar on the evening of January 10.

During the day of January 10, 1989, defendant consumed about 12 beers and took Valium and other prescription drugs, up until 5:00 or 6:00 p.m. A couple of hours later, his mother drove him to the Round Up Bar, where he was to meet Miller. After drinking one or two beers, defendant got tired of waiting for Miller, slammed his beer on the bar, and left. He went to the adjacent market, bought a few more beers, and drank them while he paced and waited, for about an hour. Having previously learned from Miller where he lived, defendant decided to go there. Walking, he arrived at the Mar Mac Manor about 10:00 p.m.

After knocking, defendant entered the boardinghouse through the front door and went up the stairs to Miller's room. Miller's door was open, and Miller was sitting there with the television on. Standing in the doorway, defendant asked Miller why he had not been at the Round Up Bar and whether he had defendant's money. Miller said he was broke and, to defendant's further inquiry, said he did not know when he would have the money to repay defendant. Defendant entered the room, and an argument

ensued. Miller yelled at defendant to get out, while defendant "could have" said something like "Just give me the money."

Miller reached down and picked up something, then charged at defendant with a knife in his hand. Defendant wrested the knife from Miller's hand and stabbed Miller in the face, but Miller came at him again with his fists. Defendant stabbed him in the side of his chest. Miller kept coming, and defendant stabbed him in his back and the back of his arm while pushing him off. Defendant fell in the struggle, and the knife blade broke off. Finally defendant, sensing Miller "had had enough," left, without going through Miller's pockets or taking anything.

Still holding the handle of the broken knife, defendant descended the stairs. Seeing Carson, he explained, "We got into it, he attacked me," but Carson did not respond or move out of defendant's way. Defendant went around him and fled the building. Not knowing what Carson would do, defendant ran. He wanted to find a telephone in order to talk to his mother before turning himself in. He knew who Wissel was because of business dealings defendant's father had had with Wissel, so he stopped there.

Wissel opened the door with a gun in his hand. When he raised the gun, defendant pulled out a pocketknife and stabbed Wissel three times. When Wissel walked to another room and picked up a telephone, defendant hit him with the phone, disabled the gun by removing the cylinder, then tied Wissel up with the phone cord and put a dresser on top of him to keep him from moving around. Defendant drank about eight beers from Wissel's refrigerator and took a handful of Valium. He ransacked the house, taking money and other things, and gathered other items to take later. When he found Wissel's dentures in a medicine cabinet, he threw them in the toilet, though he did not know why.

The police arrested defendant while he was walking the streets. The money in his pocket belonged mostly to Wissel, but a small amount was defendant's own. Because he did not want to talk to the police and was "pretty wasted," defendant lied in a police interview and said he did not know anything about Miller's death or the assault on Wissel. A few months later, he also lied to two psychiatrists appointed to examine him, because he also did not want to talk to them. He told them he had no memory of the events of the time and that his memory was largely blacked out between Christmas 1988 and his arrest on January 11, 1989.

*Penalty Phase Evidence*

*Prosecution*

The officers who found Clarence Wissel beaten and bound also found that a Medicare card had been placed in his rectum. Before the attack, Wissel was in good health for his age; he lived independently and was not limited mentally. After the attack, he could not walk or speak and was unaware of events around him. He could not feed himself, though eventually he was able to be fed by a caretaker.

Robert Miller's daughter, Terrie Ormonde, testified that as an adult she was close to her father. He spent weekends with her family, going to church with them and doing fun things with her children. After his death, Ormonde notified Miller's ailing mother, who was devastated by the news.

The prosecution introduced evidence of several prior violent crimes. In 1976, defendant knocked down a woman in a grocery store parking lot and took her purse. She suffered a serious cut on her head, as well as bruises. In 1977, he argued with his brother Peter over defendant's plan to steal from their father. Defendant, under the influence of heroin, cut Peter's hands with a pocketknife in the altercation. In 1980, another man robbed a gas station attendant at knifepoint; shortly thereafter, defendant was arrested, after a chase, driving a car in which the robber was a passenger. Also in 1980, defendant, apparently under the influence of drugs, robbed a liquor store clerk while brandishing a handgun. In 1983, he robbed a grocery store by claiming to have a weapon.

The prosecution also introduced evidence of defendant's violence while he was in custody in the Riverside County jail. In 1989, defendant grabbed a cellmate, Wesley Richards, and threw him, headfirst, into the bars of their cell, injuring Richards's eye and head. Also in 1989, correctional officers found a loose razor blade in defendant's property box. Later that year, a cellmate of defendant's was found covered in blood with injuries to his face; defendant was at the back of the cell washing his hands, which were red, cut, and trembling. In 1991, defendant shoved a cellmate headfirst into the cell bars and punched him, injuring his face. Also in 1991, defendant assisted a cellmate, Harry Copenhaver, resist extrication from their cell after Copenhaver refused to give up extra milk cartons the correctional officer said were contraband. When a team of officers came into the cell to get Copenhaver, defendant and Copenhaver pushed mattresses on them, kicked them, and hit them with weapons made by putting soap bars in socks.

*Defense*

After the 1983 grocery store robbery, defendant's blood was found to contain alcohol, opiates, and methadone. Wesley Richards testified that another cellmate besides defendant had also hit him in the 1989 incident and that his injuries were probably caused by that cellmate or by still another inmate, rather than by defendant. Copenhaver testified that in the 1991 incident he resisted being handcuffed and removed from the cell because he thought he would be beaten if he complied, and he warned his cellmates not to comply for this reason. Inmates from the next cell testified that after the fight they saw Copenhaver dragged unconscious through the hallway by sheriff's deputies and jabbed with batons, though he was not resisting.

Several members of defendant's family testified as character witnesses. Defendant's father testified defendant had worked with him at their farm and poultry processing plant and later, at their restaurant equipment business, and that he was a good worker. At some point, though, defendant developed a drug problem and began to act differently.

Defendant's mother testified he was a thoughtful child and something of a loner. In his twenties, though, he started doing drugs; in 1983, she saw him on the street with heroin. When he was released from prison in 1988, he had long hair and was paranoid. She tried to get him help through his parole officer. When she visits defendant in jail now, he cries over what he did to Miller and Wissel.

Georgeann Demetrulias, defendant's sister, testified he is a sensitive and caring person. When they were children, they had to work long hours at the family poultry business and were beaten by their mother, especially when she drank. Defendant would try to stop the beatings, then would withdraw physically; all the children tried to get away at one time or another.

Defendant's former sister-in-law testified that between 1972 and 1980 she saw defendant frequently; he was sensitive and fun and treated her daughter nicely. An aunt and cousin testified that when the cousin was growing up, defendant visited them on many occasions. He worked on cars with his uncle, visited with his grandmother, and helped his cousin swim at the beach.

Debbie Floyd was defendant's girlfriend for about two years in the late 1970's. Floyd's daughter lived with them for several months; they did activities as a family, and her daughter viewed defendant as a father figure. During their relationship, defendant started drinking and doing drugs. At defendant's suggestion, Floyd left for Virginia while pregnant with their son, Christopher Jay Demetrulias (Jay). Defendant wrote and sent money for their son.

Jay came to California to live with his half sister when he was having trouble in Virginia with school and his mother. While in California, Jay learned his father was in the Riverside County jail and talked to him on the telephone. After talking with his father, Jay moved back to Virginia, started going to school, and decided to stay away from drugs and alcohol.

Defendant's older son, Gregory Demetrulias, Jr., was raised by defendant's parents but remembers spending time with defendant at a local camp. They communicated by letter and card while defendant was incarcerated, then lived together, with defendant's parents, after his release in 1988 and before the present offenses. During that time, they lifted weights together, tinkered with things, and horsed around. Defendant, in his son's view, is not a bad person and has no hatred toward others.

Friends also testified on defendant's behalf. Victor Miceli, a Riverside County Superior Court judge, knew the Demetrulias family for many years and watched defendant grow up. Defendant often helped out with gardening and other tasks at Miceli's house, and they worked together for a number of years as volunteers at a YMCA camp. Miceli never saw defendant misbehave, but knew that defendant began getting into trouble with the law after developing a drug problem. Miceli once arranged for defendant to surrender himself to police.

A friend who met defendant in ninth grade spent time riding dirt bikes with him, but became aware around 1980 that defendant had developed a drug problem. The mother of another friend testified that drugs had caused a lot of changes for families in their neighborhood.

On the morning of January 10, 1989, defendant went to the home of Jackie Bridgewater, whom he had known for more than 20 years and who was like a mother to him. Defendant looked sick and asked Bridgewater to make telephone calls to get him help. Bridgewater called psychiatric hospitals, the Social Security office, and defendant's parole officer, but "no one would take him." Bridgewater has since visited defendant in jail; he has cried when discussing Miller and Wissel. Bridgewater has also taken her granddaughter to visit defendant; he sends the granddaughter drawings of teddy bears and hot rod cars, and the granddaughter calls him "Daddy Greg."

An expert in drug and alcohol addiction testified in general terms about heroin use, addiction, and withdrawal. He did not know whether defendant was a heroin addict or a recreational user.

*Verdicts and Judgment of Death*

The jury convicted defendant of first degree murder (Pen. Code, §§ 187, 189),[1] with a finding he personally used a knife (§§ 1192.7, subd. (c)(23), 12022, subd. (b)), and a special circumstance finding that the murder was committed while defendant was engaged in a robbery or attempted robbery (§ 190.2, subd. (a)(17)(A)). After the penalty trial, the same jury set the penalty at death. The trial court denied defendant's motion for modification of the verdict or for a new trial and sentenced him to death.

DISCUSSION

*Guilt Phase Issues*

1. *Admission of Evidence of Crimes Against Clarence Wissel*

Defendant contends the admission of evidence of his uncharged assault on Clarence Wissel, his ransacking of Wissel's house, and his theft of Wissel's property violated Evidence Code sections 352 and 1101 and deprived him of due process in violation of the United States and California Constitutions. We conclude the court did not err in admitting the evidence.

On defendant's in limine motion to exclude the Wissel evidence, the trial court ruled the similarities between the charged homicide of Robert Miller and the uncharged assault on Wissel were not sufficiently distinctive to make the Wissel evidence admissible on the identity of Miller's killer, but that the Wissel evidence was admissible to show "intent, motive, common design or plan." Before the evidence was presented, defendant renewed his objection in part, arguing that at the least the evidence should be in some manner "sanitize[d]" of inflammatory details. In the discussion that followed, the prosecutor agreed not to introduce evidence that a Medicare card was found inserted into Wissel's rectum (that evidence was ultimately introduced at the penalty phase) and that among defendant's identification cards found in his wallet at Wissel's house was one from the Department of Corrections. No other details discovered at the Wissel crime scene were excluded.

The court instructed the jury twice on the limited admissibility of the Wissel evidence, once at its introduction and once in the overall guilt phase

---

[1] Unless otherwise specified, all further statutory references are to the Penal Code.

instructions. On both occasions, the court instructed that the evidence "if believed" was not to be considered as showing defendant's bad character or "disposition to commit crimes," but only for the limited purpose of "determining if it tends to show" a characteristic "method, plan or scheme" similar to that used in the charged crime, the "intent which is a necessary element of the crime charged," or "a motive for the commission of the crime charged."

■ Defendant argues the Wissel evidence was relevant only as character evidence, i.e., to show his propensity for crime, and hence was inadmissible under Evidence Code section 1101, subdivision (a), which generally bars admission of character evidence to prove conduct on a specific occasion. We disagree. The evidence was relevant for nonpropensity purposes, in particular to show defendant's motive and intent in attacking Miller, uses expressly permitted by Evidence Code section 1101, subdivision (b). (See *People v. Kipp* (1998) 18 Cal.4th 349, 369 [75 Cal.Rptr.2d 716, 956 P.2d 1169]; *People v. Ewoldt* (1994) 7 Cal.4th 380, 393 [27 Cal.Rptr.2d 646, 867 P.2d 757].)

■ Evidence of other crimes is admissible only if relevant to prove a material fact at issue, separate from criminal propensity. (*People v. Daniels* (1991) 52 Cal.3d 815, 856 [277 Cal.Rptr. 122, 802 P.2d 906].) Motive, though not itself an ultimate fact put at issue by the charges or the defense in this case, was probative of two ultimate facts, intent and lack of justification. Viewed as motive evidence, the Wissel assault and robbery tended to prove both that defendant had the intent to rob Miller when he attacked him, an element of the charged robbery-murder special circumstance, and that defendant did not act in real or perceived self-defense. Both issues were central to the anticipated defense and were already in active dispute at the time the court ruled in limine on the Wissel evidence, for at the hearing on that motion defense counsel stated his expectation the trial evidence would put into question whether defendant went to the Mar Mac Manor with the intent of robbing Miller or only responded to Miller's attack on him. Similarly, in his opening statement, made before the prosecution put on its case-in-chief, defense counsel explained at length how the evidence would show his client stabbed Miller in self-defense, rather than in an attempt to rob him. Defendant's motive was thus important to two disputed material issues.

As to motive, the Wissel evidence tended to show defendant felt a strong need for Wissel's money and property on the night in question and acted out of that motive rather than merely to defend himself against Wissel. A trier of fact could rationally infer that defendant had also felt a strong need for money a short time earlier on the same night, when he confronted Miller, and therefore that he stabbed Miller in order to take his money rather than to defend himself against Miller.

As defendant concedes, the probativeness of other-crimes evidence on the issue of motive does not necessarily depend on similarities between the charged and uncharged crimes, so long as the offenses have a direct logical nexus. (*People v. Daniels, supra,* 52 Cal.3d at p. 857; *People v. Pertsoni* (1985) 172 Cal.App.3d 369, 374 [218 Cal.Rptr. 350].) In *Pertsoni,* the defendant, charged with the shooting murder of a man who was thought to be an agent for the Yugoslav secret police, claimed he had acted in self-defense. Evidence was admitted of an uncharged prior violent act: the defendant's having shot at a man he believed to be the Yugoslav Ambassador. (*Pertsoni,* at pp. 372–373.) Though the acts were dissimilar in the circumstances of their commission, the other-crimes evidence was held admissible to show the defendant's motive of "passionate hatred of anyone connected with the Yugoslav government." (*Id.* at p. 374.) This motive was in turn relevant to show the defendant acted "to kill an agent of the detested government, rather than to protect himself against a perceived danger." (*Id.* at p. 375.) Here, similarly, evidence of defendant's motives for robbing and assaulting Wissel tended to show he had had the same motives earlier the same night when he stabbed Miller, and thus acted with the intent to rob, rather than in self-defense.

Defendant relies on *People v. Bigelow* (1984) 37 Cal.3d 731 [209 Cal.Rptr. 328, 691 P.2d 994], in which evidence of prior robberies and thefts was held inadmissible to show the defendant's motive in his trial for murder, robbery, and kidnapping. But in that case, the defendant's motive—his desire to take the victim's property—"was not seriously contested; there was no question but that, whoever shot [the victim], the robbery, kidnapping and murder were done as part of a plan to steal [the victim's] car." (*Id.* at p. 748.) For that reason, proof the defendant had previously committed thefts or robberies to get the victims' property "adds little to the case." (*Ibid.*) The opposite was true here: Defendant admitted having stabbed Miller, but denied having tried to rob him and claimed he acted in self-defense. Here, the identity of the killer was not seriously contested, but defendant's motive in attacking and killing Miller most certainly was. *Bigelow*'s reasoning is simply inapplicable to the present case.

We also conclude the Wissel incident was similar enough to the Miller incident to bear directly on defendant's intent in stabbing Miller. To satisfy this theory of relevance, charged and uncharged crimes need only be "sufficiently similar to support the inference that the defendant ' "probably harbor[ed] the same intent in each instance." [Citations.]' " (*People v. Ewoldt, supra,* 7 Cal.4th at p. 402.) The incidents need not have the greater degree of similarity required to show the existence of a common plan or the shared distinctive pattern required to show identity. (*Id.* at pp. 402–403.)

■ Twice in one evening, defendant entered an older man's home, confronted the man alone, and stabbed the man several times hard enough to inflict very serious wounds, including in both cases stab wounds to the chest. Both times he claimed the other man had attacked or threatened him first and that he had acted in self-defense. As we have previously explained, quoting from Wigmore: " '[T]he recurrence of a similar result . . . tends (increasingly with each instance) to negative accident or inadvertence *or self-defense* or good faith or other innocent mental state, and tends to establish (provisionally, at least, though not certainly) the presence of the normal, i.e., criminal, intent accompanying such an act . . . .' " (*People v. Ewoldt, supra,* 7 Cal.4th at p. 402, italics added.) The jury could rationally find it unlikely that defendant had the extremely bad luck to be attacked within a short period of time by two older solitary men in ways that required him to use potentially deadly force against the older men to repel the attacks. Especially given the evidence that defendant's assault on Wissel went far beyond any conceivable need for self-defense and that defendant then ransacked Wissel's house and stole from him, the jury could rationally infer instead that defendant probably attacked both men with the same criminal intent—robbery.

Defendant points to several factual differences between the two incidents, some of which we acknowledge were shown by the evidence: though both victims were older than defendant, Wissel was significantly older than Miller; Wissel lived in a single-family house, Miller in a boardinghouse; whereas defendant stayed at Wissel's house for hours, ransacked it, and stole Wissel's property, the evidence he took anything from Miller was weak at best, and no evidence showed he disturbed Miller's furnishings before fleeing, which he did immediately after stabbing Miller; defendant, in the words of his brief, "degraded" Wissel in a "bizarre" crime, while he simply stabbed Miller several times with a knife.

Especially in light of the close proximity in place and time between the two incidents, we disagree that these dissimilarities vitiated the inference that defendant had the same intent in each incident. Given the evidence that immediately after his fatal stabbing of Miller, defendant walked or ran less than a mile to Wissel's house, where he stabbed and otherwise assaulted that victim, and given the other similarities outlined above, a jury could rationally reject the coincidental explanation for the two events—that defendant just happened to have assaulted somewhat similar victims in somewhat similar ways on the same night—and conclude instead that he harbored the same criminal intent in both cases. "[W]hen the other crime evidence is admitted solely for its relevance to the defendant's intent, a *distinctive* similarity between the two crimes is often unnecessary for the other crime to be relevant. Rather, if the other crime sheds great light on the defendant's intent at the time he committed that offense it may lead to a logical inference of his intent at the time he committed the charged offense if the circumstances of

the two crimes are substantially similar even though not distinctive." (*People v. Nible* (1988) 200 Cal.App.3d 838, 848–849 [246 Cal.Rptr. 119, 247 Cal.Rptr. 396].)

The decisions defendant cites as illustrating insufficient similarity between charged and uncharged crimes to establish relevance on intent are each distinguishable.

In *People v. Williams* (1988) 44 Cal.3d 883, 907–908 [245 Cal.Rptr. 336, 751 P.2d 395], the People argued that evidence of prior thefts, committed some days or weeks before the charged robbery murders, tended to negate the defendant's diminished capacity defense, which was based partly on drug and alcohol intoxication. We rejected this theory of relevance because of the complete lack of evidence the defendant had used drugs or alcohol at the time of the prior thefts, a crucial dissimilarity that fatally undermined the logical connection the People had attempted to draw between the charged and uncharged crimes. (*Id.* at pp. 908–909.) Defendant points to no such crucial dissimilarity in the present case. Though the victims and their circumstances differed in some ways, the crimes—stabbing assaults on older men alone in their homes, committed very close together in time and place—were sufficiently alike to support an inference that if defendant acted with an intent to rob rather than in self-defense in the Wissel case, he did so as well in stabbing Miller.

In *People v. Guerrero* (1976) 16 Cal.3d 719, 727–728 [129 Cal.Rptr. 166, 548 P.2d 366], we rejected the use of a prior rape to show that the charged murder was committed in the course of an attempted rape, i.e., to show the defendant's intent in engaging in sexual activity with the victim. The fatal flaw in this theory, we explained, was the lack of any evidence that in the charged killing the defendant *had* engaged in any sexual activity with the victim. The prior rape was thus improperly being used both to establish that the charged incident involved sexual activity and to explain the intent with which the defendant engaged in that sexual activity. (*Id.* at p. 728.) "In short, the People may not conjure up an attempted rape in this instance in order to introduce evidence of another rape." (*Ibid.*) In the case at bench, of course, there *was* independent evidence defendant was robbing or trying to rob Miller when he killed him: the testimony of two boardinghouse residents that they heard the assailant demand, "Give me your wallet" or "Give me your money." Unlike *Guerrero*, the prosecution here did not use the Wissel evidence to "conjure up" an intent to rob in the charged Miller homicide.

Finally, in *People v. Harvey* (1984) 163 Cal.App.3d 90, 104–105 [208 Cal.Rptr. 910], the appellate court found a prior robbery the defendant had committed in the same area six months earlier insufficiently similar to the

charged homicide to show an intent to rob in the charged incident. The appellate court's reasoning on this point is neither clear nor persuasive; the court simply referred (*id.* at p. 105) to its earlier discussion regarding proof of identity, without explicitly considering whether the lack of " 'distinctive' " similarities that made the prior crime irrelevant on identity (*id.* at p. 103) also precluded an inference that the assailant in the two incidents acted with the same criminal intent. As noted, this court later clarified that the distinctiveness needed to prove identity is not required to make an uncharged crime relevant on intent. (*People v. Ewoldt, supra,* 7 Cal.4th at pp. 402–403.) In any event, the six-month passage of time between the uncharged and charged crimes in *Harvey* distinguishes it from this case. As explained above, the closeness of time between the incidents here—a matter of minutes, rather than days or months—provides, together with the other similarities already noted, a significant basis for an inference that defendant acted with the same criminal intent in the two incidents.

Because the Wissel evidence was relevant on motive and intent, we need not decide whether it bore the somewhat greater similarity to the Miller attack required to be relevant on the existence of a common design or plan (see *People v. Ewoldt, supra,* 7 Cal.4th at pp. 402–403). The court's instruction that the jury could also consider the evidence for whether it showed a common design or plan could not, under the circumstances, have been prejudicial. The jury was properly permitted to consider the Wissel evidence on the hotly disputed issue of whether defendant stabbed Miller in self-defense or with the intent to rob him. Not surprisingly, as this was the crucial factual question of the trial, the prosecutor's discussion of the Wissel evidence in his argument to the jury focused largely on this question. Though the prosecutor referred to a similar "pattern of conduct" in the two incidents, he did not argue for the existence of a common design or plan as such. That the jury, which was properly permitted to consider the Wissel evidence on the central questions of self-defense and intent to rob, would have reached a different result had it not been told it could also consider the evidence on whether defendant had a common design or plan in the two incidents—a peripheral question at most—is not reasonably probable. (*People v. Welch* (1999) 20 Cal.4th 701, 749–750 [85 Cal.Rptr.2d 203, 976 P.2d 754].)[2]

Nor do we agree with defendant that the probative value of the Wissel evidence was outweighed by its potential for prejudice. The evidence was

---

[2] In light of this conclusion, we need not address defendant's claim the instruction on common design or plan was inadequate or erroneous in failing to tell the jury the plans must be *highly* similar and in stating that the existence of a common plan could tend, in turn, to show defendant's criminal intent. (On the latter point see contra, *People v. Ewoldt, supra,* 7 Cal.4th at p. 394 & fn. 2.) Neither the instruction as a whole nor these particular features bore a reasonable probability of prejudice because common design or plan was not an important issue compared to those issues on which the evidence was properly admitted.

strongly probative on the central issue at trial, whether defendant stabbed Miller in self-defense or with the intent of robbing him. Though the evidence's probative value was attenuated to some extent by dissimilarities between the incidents, "[t]he close proximity in time of the uncharged offenses to the charged offenses increases the probative value of this evidence." (*People v. Balcom* (1994) 7 Cal.4th 414, 427 [27 Cal.Rptr.2d 666, 867 P.2d 777].) Some aspects of the Wissel evidence were potentially inflammatory, but at the same time the ferocity and extent of defendant's attack on Wissel was probative of his criminal intent and lack of need for self-defense. The jury was twice instructed not to consider the Wissel evidence as showing bad character, minimizing the potential for improper use (*People v. Barnett* (1988) 17 Cal.4th 1044, 1119 [74 Cal.Rptr.2d 121, 954 P.2d 384]), and the prosecutor did not suggest to the jury that it consider the Wissel evidence for any improper purpose. The Wissel incident involved an assault, albeit a very serious one, rather than a homicide like the charged attack on Miller. The jury, moreover, was informed through defendant's testimony that he had pled guilty to assault and robbery and was serving a sentence for the Wissel crimes. This greatly reduced the likelihood, if any existed, that the jury would convict defendant of the capital murder of Miller in order to punish him for the assault on Wissel. (*Balcom*, at p. 427.) Under these circumstances, the trial court did not abuse its discretion under Evidence Code section 352 in admitting the Wissel evidence, nor did that ruling infringe upon defendant's constitutional right to a fair trial.[3]

## 2. *Admission of Evidence of Victims Peaceful Characters*

Defendant contends certain testimony elicited during the prosecution's case-in-chief about Miller's and Wissel's nonaggressive or nonviolent characters violated Evidence Code section 1103, subdivision (a). As the cited provision states not a rule of exclusion but an exception to one, we understand defendant to be arguing, more precisely, that the admission of this evidence violated the rule against use of character evidence to show conduct on a particular occasion (*id.*, § 1101, subd. (a)) because it was not within the exception for rebuttal of defense evidence of the victim's character (*id.*, § 1103, subd. (a)(2)).[4] We conclude defendant forfeited the issue of the

---

[3] Defendant argues the jury may well have known that Wissel had died by the time of trial, and the court should therefore have instructed the jury that defendant did not kill Wissel. But as there was no evidence as to whether the effects of defendant's attack hastened Wissel's death, the court could not give such an instruction with complete confidence it was correct. In any event, it was unnecessary. Whatever the jury surmised about Wissel's death, it knew defendant had been convicted only of assault and robbery against him. From a legal point of view, Wissel's death was not attributable to defendant, and the jury knew that.

[4] Evidence Code section 1103 provides in part: "(a) In a criminal action, evidence of the character or a trait of character (in the form of an opinion, evidence of reputation, or evidence of specific instances of conduct) of the victim of the crime for which the defendant is being

evidence's admission by his failure to make a timely objection on this ground. (*Id.*, § 353, subd. (a).)

The issue arises as follows. The prosecutor asked the cashier at the Yum Yum Restaurant, where Miller was a regular customer, whether she had ever seen Miller acting "hostile or threatening or violent towards anybody." The defense objection, "irrelevant," was overruled, and the witness answered, "No." Similarly, a bartender at the Round Up Bar testified, over a defense objection of "relevance and speculation, foundation," that Miller was nice and polite, not angry or threatening, on the occasions when she had seen him there. A fellow tenant at the Mar Mac Manor testified, over defense objections of "foundation" and "speculation," that he had never known Miller to be hostile. Clarence Wissel's daughter testified, over a defense objection of "irrelevant," that he was a quiet man who avoided conflict. Finally, in response to *defense* counsel's question whether she considered Miller a friend, the owner of the Round Up Bar testified that Miller was just a customer, but he was a "very nice man" who would give anyone who asked the "shirt off his back." The court denied the defense motion to strike this answer as nonresponsive.

Later, on the basis of defense statements indicating that defendant was claiming self-defense, the prosecution sought to call other witnesses to testify to Miller's peaceful character. The defense moved to exclude the witnesses, arguing the self-defense claim did not open the door to such rebuttal character evidence (Evid. Code, § 1103, subd. (a)(2)) because the defense had not and would not introduce any negative *character* evidence regarding Miller (*id.*, subd. (a)(1)). At the same time, the defense moved to strike any previous references to either victim's peaceful character. The court, agreeing the character evidence door would not be opened simply by defendant's likely testimony that Miller had attacked him, excluded the proposed prosecution witnesses, but declined to strike the "limited and brief reference[s]" to the victims' characters already in the record.

Evidence Code section 353, subdivision (a) allows a judgment to be reversed because of erroneous admission of evidence only if an objection to the evidence or a motion to strike it was "timely made and so stated as to make clear the specific ground of the objection." Pursuant to this statute, " 'we have consistently held that the "defendant's failure to make a timely and specific objection" on the ground asserted on appeal makes that ground not cognizable.' " (*People v. Partida* (2005) 37 Cal.4th 428, 433–434

---

prosecuted is not made inadmissible by Section 1101 if the evidence is: [¶] (1) Offered by the defendant to prove conduct of the victim in conformity with the character or trait of character. [¶] (2) Offered by the prosecution to rebut evidence adduced by the defendant under paragraph (1)."

[35 Cal.Rptr.3d 644, 122 P.3d 765].) Under this principle, defendant's claim that the admission of evidence of the victims' peaceful characters violated Evidence Code section 1103 is not cognizable; defendant forfeited his claim by failing to make timely objections or a timely motion to strike on that specific ground.[5]

■ Defendant made timely objections (or in the case of the Round Up Bar owner's testimony, a timely motion to strike), but not on the grounds now asserted. Contrary to defendant's argument, a relevance objection does not, in itself, alert the trial court to the claim that the testimony objected to is inadmissible character evidence. Evidence of a character trait has a "tendency in reason" (Evid. Code, § 210) to prove the person's conduct in conformity with that trait on a particular occasion. Indeed, the Law Revision Commission comment to Evidence Code section 1100 notes that "[e]vidence of a person's character or a trait of his character is relevant . . . when offered as circumstantial evidence of his conduct in conformity with such character or trait of character." (Cal. Law Revision Com. com., 29B pt. 3 West's Ann. Evid. Code (1995 ed.) foll. § 1100, p. 431.) The general rule against its use for this purpose (Evid. Code, § 1101, subd. (a)) is founded not on lack of relevance but on "Extrinsic Policies" (*id.*, tit. of div. 9) relating to prejudice, the potential for the jury to be distracted and base its decision on the parties' characters themselves, and the potential for confusion of the issues and extended inquiry into collateral matters. (See Cal. Law Revision Com. com., *supra*, foll. § 1101, p. 438.) Nor did defense counsel's objections that the testimony lacked foundation, was speculative, or nonresponsive reasonably specify the character evidence claim now presented.

Defendant did rely on Evidence Code section 1103 (and thus impliedly on Evidence Code section 1101, to which section 1103 is an exception) in his motion to strike the testimony, which was made some days afterward. The motion was thus specific enough, but not timely. "When the nature of a question indicates that the evidence sought is inadmissible, there must be an objection to the question; a subsequent motion to strike is not sufficient." (*People v. Perry* (1972) 7 Cal.3d 756, 781 [103 Cal.Rptr. 161, 499 P.2d 129], overruled on other grounds in *People v. Green* (1980) 27 Cal.3d 1, 28 [164 Cal.Rptr. 1, 609 P.2d 468]; see *Hiser v. Bell Helicopter Textron Inc.* (2003) 111 Cal.App.4th 640, 657–658 [4 Cal.Rptr.3d 249] [failure to object at the time of testimony forfeited claim under Evid. Code, § 353, notwithstanding motion to strike at close of day's trial proceedings].) "Any other rule would in a great

---

[5] The same is true as to defendant's appellate claim that admission of this "propensity" evidence in violation of Evidence Code section 1103 infringed his constitutional due process rights.

measure do away with the necessity of interposing seasonable objections and enlarge the motion to strike out." (*People v. Scalamiero* (1904) 143 Cal. 343, 346 [76 P. 1098].)

The same rule applies here, even though defendant did object to the testimony before it was given, because those objections were not made on the specific ground now urged. To satisfy Evidence Code section 353, subdivision (a), the objection or motion to strike must be both timely *and* specific as to its ground. An objection to evidence must generally be preserved by specific objection at the time the evidence is introduced; the opponent cannot make a "placeholder" objection stating general or incorrect grounds (e.g., "relevance") and revise the objection later in a motion to strike stating specific or different grounds. In *People v. Camacho* (1993) 19 Cal.App.4th 1737, 1745 [24 Cal.Rptr.2d 286], for example, the appellate court held the defendant had forfeited his claim of improper examination by the trial court where, though he initially objected on other grounds, his objection that the court was improperly "cross-examining" him was raised only later, after additional testimony. Similarly, in *People v. Horn* (1960) 187 Cal.App.2d 68, 76–78 [9 Cal.Rptr. 578], the defendant's hearsay claim was held forfeited because at the time the evidence was admitted the defendant objected only that it was " 'incompetent, irrelevant and immaterial,' " though he later submitted a further objection on hearsay grounds. Though the trial court in this case could perhaps have excused the untimeliness of defendant's objection and stricken the testimony (which was, as the court noted, "limited and brief"), it was not required to do so.

### 3. *Refusal of Jury Instruction on Claim of Right*

The defense requested the following special instruction be given to the jury: "A belief in the right to reclaim one's property negates the specific intent necessary to constitute robbery. If such specific intent is not present at the time of the alleged offense then the special circumstance of robbery, or attempted robbery, is not proved." The trial court refused this request, apparently because of counsel's failure to present the court with published authority for the special instruction.

Defendant now cites *People v. Butler* (1967) 65 Cal.2d 569 [55 Cal.Rptr. 511, 421 P.2d 703], as supporting the requested instruction. In *People v. Sakarias* (2000) 22 Cal.4th 596, 622 [94 Cal.Rptr.2d 17, 995 P.2d 152], we explained that *Butler* had been overruled "to the extent it allowed a claim-of-right defense to robbery where the alleged robber's intent was to collect a claimed debt, rather than to recover specific property taken from him. (*People v. Tufunga* (1999) 21 Cal.4th 935, 956 [90 Cal.Rptr.2d 143, 987 P.2d 168].)" We also held, however, that "[a]pplication of that holding to conduct

preceding *Tufunga*'s finality . . . would constitute an unforeseeable retroactive expansion of criminal liability, in violation of due process. (*Bouie v. City of Columbia* (1964) 378 U.S. 347, 353 [12 L.Ed.2d 894, 84 S.Ct. 1697].)" (*Ibid.*)

At oral argument, the Attorney General suggested defendant's testimony did not support a claim-of-right instruction even under the law at the time of his trial because defendant testified that he went to Miller's room with the intent of *peacefully* collecting the $40 debt, not with the intent of retaking his money by force, and insisted that he used force only in response to Miller's attack. In the abstract, however, the possibility existed the jury could believe defendant about the existence of the debt, but not about his intent to collect it peacefully. Belief in this factual theory was, as explained below, very unlikely, but its theoretical possibility arguably supported the giving of a claim-of-right instruction under *People v. Butler*, *supra*, 65 Cal.2d 569.

Even assuming the instruction should have been given, we agree with the Attorney General that any error was harmless even under the standard of *Chapman v. California* (1967) 386 U.S. 18, 24 [17 L.Ed.2d 705, 87 S.Ct. 824]. (See *People v. Creath* (1995) 31 Cal.App.4th 312, 320 [37 Cal.Rptr.2d 336] [applying *Chapman* standard without discussion].) Although not given the proposed claim-of-right instruction, the jury was instructed on the element of specific intent to take property from another and deprive the other person permanently of that property necessary for a finding of robbery, and hence murder in the commission of a robbery, as well as on the specific intent to rob necessary to find attempted robbery. Defense counsel argued the special circumstance was not proved because the evidence showed "that Greg Demetrulias was in Mr. Miller's room over a debt, not a robbery. And that Greg Demetrulias acted in self-defense when Mr. Miller came at him with a knife." The prosecutor did not suggest to the jury that collection of a debt could constitute robbery, but rather argued defendant had simply invented the $40 debt to explain his demand for Miller's money, which he knew had been overheard by witnesses.

As defense counsel's argument indicates, the claim defendant went to Miller's room merely to collect a debt was closely tied to the claim of self-defense. The jury had many reasons to reject defendant's self-defense claim, as it clearly did, and the same reasons, by and large, suggested rejection of defendant's claim he was only trying to collect a debt. Defendant's self-serving testimony regarding the debt was completely uncorroborated; whether he and Miller were even acquainted was disputed, but no evidence other than defendant's testimony existed to show Miller had borrowed money from defendant. Miller's fellow tenants heard his killer demand, "Give me your wallet," not "Give me the $40 you borrowed."

Circumstantial evidence suggested defendant took the knife he used to kill Miller from the Mar Mac Manor kitchen on his way to Miller's room; he would have had no reason to take a knife if he had come simply to ask for his $40. The number and severity of the stab wounds defendant inflicted on Miller strongly suggested defendant's intent was not limited either to repelling an attack from the older man or recovering his loan. Defendant fled from the scene, indicating consciousness of guilt, and later falsely denied any knowledge of the events. Shortly after killing Miller, defendant assaulted Wissel, who had not borrowed any money from him, and stole more than $1,000 and much additional property from Wissel. If defendant's intent with Miller were simply to seek repayment of a $40 debt, why would he come armed with a kitchen knife, stab Miller four times, flee the scene, and shortly thereafter attack an even more vulnerable victim and take from him many times the amount of Miller's supposed debt?

The jury, by its first degree murder verdict, necessarily rejected defendant's testimony that he acted in self-defense (perfect or imperfect). We see no reasonable basis on which a jury could have rejected self-defense but accepted a claim-of-right claim. Both defense theories rested solely on defendant's testimony, and no reason appears in the evidence for a trier of fact to believe defendant as to the debt collection but not as to Miller's asserted attack on him; indeed, as discussed above, the evidence casting great doubt on defendant's version of events applies to both defense theories. The jury was instructed generally on the need to find specific intent to rob or steal, and neither party's argument to the jury suggested that collection of a debt could be robbery. Under all these circumstances, any error in failing to give the requested claim-of-right instruction was harmless beyond a reasonable doubt. (*Chapman v. California, supra,* 386 U.S. at p. 24.)

### 4. *Refusal of Instructions on Heat-of-passion Voluntary Manslaughter*

Defendant requested the jury be instructed on voluntary manslaughter committed "upon a sudden quarrel or heat of passion" prompted by sufficient provocation. (§ 192, subd. (a).) The trial court refused, reasoning that defendant's testimony did not show any provocation other than Miller's asserted attack on defendant, which warranted instructions on self-defense and voluntary manslaughter as a killing done out of an honest but unreasonable belief in the need for self-defense, but not on heat-of-passion voluntary manslaughter. The jury was therefore instructed only on imperfect self-defense voluntary manslaughter.

We need not decide whether the trial court was required to instruct on heat-of-passion voluntary manslaughter, because any error in failing to do so

was clearly harmless, even under the standard of *Chapman v. California*, *supra*, 386 U.S. at page 24, which defendant argues applies. (See *People v. Breverman* (1998) 19 Cal.4th 142, 165–166 [77 Cal.Rptr.2d 870, 960 P.2d 1094] [failure to instruct *on court's own motion* on lesser included offense in *noncapital* case is error of state law only].) The jury found true the special circumstance allegation that defendant killed Miller in the course of, and in order to advance, the commission or attempted commission of a robbery. The robbery-murder special-circumstance finding also dictated a finding of first degree felony murder under section 189 and the corresponding felony-murder instruction, which was properly given. The failure to instruct on one theory of voluntary manslaughter was therefore harmless, as the jury necessarily determined the killing was first degree murder, not manslaughter, under other properly given instructions. (*People v. Koontz* (2002) 27 Cal.4th 1041, 1085–1086 [119 Cal.Rptr.2d 859, 46 P.3d 335]; *People v. Lewis* (2001) 25 Cal.4th 610, 646 [106 Cal.Rptr.2d 629, 22 P.3d 392].)

5. *Exclusion of Hearsay Evidence as to When Miller Paid His Rent*

Defendant contends the trial court erred in excluding hearsay evidence that Miller paid the rent for his Mar Mac Manor room only 20 or 30 minutes before he was killed, which defendant maintains would have tended to show he did not steal any money from Miller. Defendant does not argue that the evidence, statements of the Mar Mac Manor manager to the boardinghouse owner and to investigating officers, was within any statutory exception to the hearsay rule; instead, he urges this court to hold the evidence should have been admitted on the nonstatutory ground that it was "critical reliable evidence" offered in a capital trial. We conclude the trial court properly declined to recognize a nonstatutory exception for the proposed evidence in this case.

The issue arises as follows. Detective Frogue, who investigated Miller's death, testified he reached the conclusion that all the cash found on defendant at his arrest belonged to Clarence Wissel, and he therefore gave the cash to a member of Wissel's family. Defense counsel's question whether Frogue learned something about the money from Herb Hamilton, the Mar Mac Manor manager, drew a prosecution hearsay objection, which was sustained.

Out of the jury's presence, defense counsel offered to show that Hamilton, deceased by the time of trial, told Frogue that Miller had given him the rent at 9:00 or 9:30 on the night of January 10, after Miller had dinner at the Yum Yum Restaurant and shortly before he was killed. He argued such evidence was important to dispel any impression that at the time of his death Miller still had the hundreds of dollars the Yum Yum cashier observed, and hence

that defendant stole that money from Miller. Counsel conceded he could think of no applicable exception to the hearsay rule, but argued due process required the trial court to admit the evidence under a "catchall" exception. The court excluded the offered hearsay, ruling it was not within any exception and was unnecessary in light of Frogue's testimony that he had concluded all the money found on defendant was taken from Wissel. The offer was later renewed, counsel noting that Hamilton's statement was recorded in two police reports, but again arguing not for any statutory exception to the hearsay rule but for a due process or "catchall" exception. The court adhered to its earlier ruling, stating as well that it did not consider the evidence entirely reliable.

Marjorie McCrory, owner of the Mar Mac Manor, testified for the defense that she kept records of rent, which was paid to her manager, in a diary. The diary reflected that Miller had paid his $275 monthly rent on January 10, 1989, the day of his death. The entry did not say what time the rent was paid or whether it was in cash or by money order, but McCrory remembered that Miller always paid cash.

Just before McCrory testified, addressing "records we'll be seeking to use," defense counsel showed the court and prosecutor that, at the bottom of her diary entry regarding Miller, McCrory had written "murdered by a parolee shortly after paying rent on January 10th." Counsel explained he had advised McCrory not to discuss that note during her testimony "pending any ruling you [the court] might make on it," and that "[a]ssuming that you find that that's not appropriate, I would ask the Court might also advise her similarly." The court then cautioned McCrory, out of the jury's presence, not to volunteer anything about her note regarding Miller's death.

While the defense clearly made an offer of proof as to Frogue's testimony, the colloquy over McCrory's testimony does not demonstrate the defense sought to introduce her note regarding Miller's death or to elicit testimony to the same effect. Rather, it appears counsel (for obvious reasons) wanted to *avoid* McCrory saying that Miller was "murdered" by a "parolee" shortly after paying his rent. Counsel asked the court to caution McCrory not to discuss the note, and the court, without prosecutorial objection, did so. Defendant, by requesting exclusion rather than admission of the evidence, waived any appellate claim that the note, or testimony in accord with it, should have been admitted. (See Evid. Code, § 354.)

Moreover, defense counsel did not suggest any statutory hearsay exception was applicable to either McCrory's or Frogue's testimony. Defendant now asserts the statement in McCrory's records was "arguably" within the business records exception (Evid. Code, § 1271) and the statement

to Frogue "might be viewed" as an excited utterance (*id.*, § 1240), but he provides no actual arguments for either assertion, even in response to the Attorney General's detailed arguments to the contrary. The defense completely failed to establish at trial the foundational facts necessary for these exceptions, for example that McCrory's note as to the agency, criminality, and time of her tenant's death was made "in the regular course" of her boardinghouse business (*id.*, § 1271, subd. (a)) or that Hamilton's statement to Frogue was made spontaneously and while Hamilton was under the "stress of excitement" caused by perceiving the event narrated (*id.*, § 1240, subd. (b)). The burden of producing evidence to establish these foundational facts fell to defendant as the proponent of the evidence, and in the absence of such foundational evidence, we will not assume error. (*People v. Ramos* (1997) 15 Cal.4th 1133, 1177–1178 [64 Cal.Rptr.2d 892, 938 P.2d 950].)

 Although California appellate courts have the authority to recognize nonstatutory exceptions to the hearsay rule, we do so cautiously in light of the venerable policy against admitting declarations by witnesses who cannot be cross-examined. (*People v. Ayala* (2000) 23 Cal.4th 225, 268 [96 Cal.Rptr.2d 682, 1 P.3d 3].) Whether or not an exception for "critical reliable evidence" in capital cases might deserve recognition, this case does not present a suitable occasion because the evidence at issue was neither critical nor entirely reliable.

The jury heard that on January 10, 1989, Miller withdrew $340 from his bank account, paid his $275 rent, ate dinner at a restaurant, and had about $35 on his person when he died. Consistent with this, the jury also heard that the investigating detective had concluded the more than $1,000 in cash found on defendant when he was arrested came largely or wholly from Wissel. Defendant argues the testimony of the Yum Yum Restaurant cashier, that Miller had what looked like several hundred dollars in cash when he ate dinner, could have led the jury to surmise Miller had hundreds of dollars— which defendant stole—even after paying his rent. But no such inference arises naturally from the evidence; a juror could conclude at least as readily that Miller had disposed of his cash by paying his rent *after* dinner.

Moreover, evidence Miller did pay the rent after dinner would not establish that he did not have additional cash on hand at the time of his encounter with defendant. Defendant fears one or more jurors might have imagined Miller had much more on hand during the day of January 10 than the $340 he had withdrawn, so much that even after paying his rent he still had hundreds of dollars when he ate dinner at the Yum Yum Restaurant. But a juror who imagined Miller had this much additional cash could as easily believe he still had it when he was attacked by defendant despite having paid his rent *after* dinner. The timing of Miller's rent payment does not show how much cash he had on January 10 in addition to the rent money.

Finally, and most importantly, robbery murder was established as fully by evidence defendant *attempted* to rob Miller as by evidence he actually completed a robbery. The prosecution case for attempted robbery—consisting largely of the fellow tenants' testimony that Miller's assailant demanded money—was unaffected by the defense suggestions that nothing was actually taken from Miller's room. The proposed evidence was therefore not critical to the defense.

As to reliability, McCrory's note reflects a statement made by Hamilton that includes his conclusions, drawn from unknown sources, that the killing was "murder" by a "parolee" and states only that Miller had paid his rent "shortly" before being killed, which does not pin down the time to before or after dinner. Hamilton's statement to Frogue may be reliable enough in itself, and was apparently more precise as to timing, but, as the Attorney General notes, cross-examination of Hamilton, were he available, might have shed a different light on his statement, for example by showing Miller had a significant sum left even after paying his rent. The principle behind the hearsay rule, that declarations not subject to cross-examination are inherently unreliable, is applicable here and militates strongly against creating a new exception to the rule in this case.

For the same reasons—the evidence was neither critical to the defense case nor wholly reliable—its exclusion did not deprive defendant of his constitutional right to a fair trial.

### 6. *Cumulative Prejudice from Guilt Phase Error*

Defendant contends the cumulative effect of errors in the guilt phase of trial was prejudicial and requires reversal. We disagree. Although we have assumed error in three respects (the trial court's instruction that the Wissel evidence could be considered as showing a common design or plan (*ante*, pt. 1) and its failure to give requested instructions on claim of right (*ante*, pt. 3) and heat of passion (*ante*, pt. 4)), we found all three assumed errors harmless. The two omitted instructions, moreover, went to different jury findings—heat of passion to whether defendant harbored malice when he killed Miller, and claim of right to whether he killed Miller in the course of a robbery, attempted or complete. Any adverse effects of omitting these instructions therefore could not have added together. Nor can we see how the additional design or plan portion of the other-crimes instruction could have aggravated any effect of the omitted instructions on claim of right or heat of passion.

### 7. Defendant's Impeachment with Statements Taken in Violation of Miranda

The trial court granted in part defendant's motion to exclude his statements to Detective Frogue made after his arrest (in which he denied he knew anything about the assaults on Miller and Wissel). Because the detective had continued his questioning after defendant was advised of and declined to waive his right not to talk to the detective (*Miranda v. Arizona* (1966) 384 U.S. 436 [16 L.Ed.2d 694, 86 S.Ct. 1602]), the court held, postinvocation statements could not be used in the government's case-in-chief, but could be used for impeachment if defendant testified, which he later did. (See *Harris v. New York* (1971) 401 U.S. 222, 225–226 [28 L.Ed.2d 1, 91 S.Ct. 643] (*Harris*); *People v. Peevy* (1998) 17 Cal.4th 1184, 1188 [73 Cal.Rptr.2d 865, 953 P.2d 1212] (*Peevy*).)

Defendant contends use of his statements in impeachment should also have been prohibited because in questioning him Detective Frogue deliberately failed to honor his invocation of the right to remain silent.[6] As defendant recognizes, we rejected this argument for an exception to the *Harris* rule in *Peevy, supra,* 17 Cal.4th at pages 1196–1202. Defendant argues that *Peevy*'s holding should be reevaluated in light of *Dickerson v. United States* (2000) 530 U.S. 428 [147 L.Ed.2d 405, 120 S.Ct. 2326] (*Dickerson*), but we fail to see *Dickerson*'s bearing on the question.

The *Dickerson* court held that *Miranda*'s protections are constitutionally required and therefore could not be altered by statute. (*Dickerson, supra,* 530 U.S. at pp. 438–441.) The high court acknowledged that some of its decisions, including *Harris, supra,* 401 U.S. 222, had limited *Miranda*'s application, but explained those decisions were not inconsistent with *Miranda*'s constitutional foundation: "These decisions illustrate the principle—not that *Miranda* is not a constitutional rule—but that no constitutional rule is immutable. No court laying down a general rule can possibly

---

[6] Although the Attorney General does not dispute defendant's claim that Frogue deliberately continued questioning after invocation of a *Miranda* right, the record is actually ambiguous as to the deliberateness of the violation. At the hearing on defendant's motion, Frogue first testified he did not think defendant had ever firmly invoked his right to remain silent and that his habit and custom was to stop an interview when the suspect invoked *Miranda* rights. On cross-examination, however, he said he had learned from training materials and classes that an interviewer could continue questioning after a suspect invoked the right to remain silent (but not the right to have an attorney present) because a subsequent statement could be used for impeachment. On redirect, Frogue said he ended the interview if a suspect definitely said he did not want to talk. In litigating the exclusion motion, the prosecution disputed whether defendant had clearly and unequivocally articulated his desire not to talk to the detective, and while the trial court resolved this question in favor of the defense, the court expressly declined to find that Frogue had heard the invocation and intentionally ignored it when he continued questioning defendant.

foresee the various circumstances in which counsel will seek to apply it, and the sort of modifications represented by these cases are as much a normal part of constitutional law as the original decision." (*Dickerson*, at p. 441.) *Dickerson*, as the high court understood its decision, is clearly not inconsistent with *Harris*.

Our decision in *Peevy* did not rest on the premise *Miranda*'s rules are nonconstitutional. Indeed, in *Peevy* we expressly disagreed with the People's argument that *Miranda* "impose[s] no affirmative duties upon police officers, but merely establish[es] rules of evidence" or "mere advice regarding preferred police conduct." (*Peevy*, *supra*, 17 Cal.4th at p. 1202.) We recognized in *Peevy* that *Miranda* states required rules of conduct for police officers, drawn from the United States Constitution, but held the deliberateness of a violation of those rules did not alter the balance struck in *Harris* and other cases "between deterring police misconduct and exposing defendants who commit perjury at trial." (*Peevy*, at p. 1202.) The high court's reiteration of *Miranda*'s constitutional principles in *Dickerson* therefore does not affect our holding in *Peevy*.

The trial court did not err in allowing defendant to be impeached with his statements to Detective Frogue.

*Penalty Phase Issues*

### 1. *Prosecutorial Misconduct in Penalty Phase Argument*

Defendant contends the prosecutor committed misconduct at five points in his penalty phase argument to the jury.[7] We conclude defendant forfeited some of his claims by failing to object and seek an admonition (*People v. Boyette* (2002) 29 Cal.4th 381, 432 [127 Cal.Rptr.2d 544, 58 P.3d 391]; *People v. Samayoa*, *supra*, 15 Cal.4th at p. 841) and that, in any event, none of the challenged prosecutorial remarks were improper.

In penalty phase argument, the prosecutor maintained the evidence of "hardships" defendant had suffered when younger "can never excuse or even

---

[7] Within this claim, defendant also points to two aspects of the prosecution's *guilt* phase conduct he contends were improper. In light of our earlier conclusions on related guilt phase issues, neither contention requires extended discussion. Because the Wissel evidence was admissible under Evidence Code section 1101, subdivision (b), its introduction was not misconduct, nor did defendant object on the basis of prosecutorial misconduct (see *People v. Samayoa* (1997) 15 Cal.4th 795, 841 [64 Cal.Rptr.2d 400, 938 P.2d 2]) to the Wissel evidence or to questions regarding the victims' peaceful characters. (See *ante*, pts. 1 & 2.) The prosecutor did not misconduct himself by seeking a robbery-murder special-circumstance finding despite being aware of hearsay evidence that Miller had paid his rent shortly before being killed; whenever Miller paid his rent, the prosecutor was entitled to pursue the theory, which was not precluded by the excluded hearsay evidence, that defendant robbed Miller of *other* money or, at the least, attacked him to advance an *attempted* robbery. (See *ante*, pt. 5.)

explain his violent choices in life." He continued: "And who hasn't suffered some hardship in their life? Who hasn't been disadvantaged in some way? All of us. There are no excuses for what he did to Mr. Miller or Mr. Wissel or the number of other victims. And should you choose life without parole for the defendant, based on this, then no human being would ever receive the death penalty because there is always some disadvantage or hardship that they may have suffered."

Defendant contends this argument improperly suggested the jury could not legally consider his past hardships in deciding on penalty. He did not object or seek a jury admonition, which could have cured any prejudice, and has therefore forfeited his appellate claim. (*People v. Jackson* (1996) 13 Cal.4th 1164, 1239 [56 Cal.Rptr.2d 49, 920 P.2d 1254].)[8] We also disagree on the merits. The prosecutor elsewhere acknowledged to the jurors that under the law the defense could present, and had presented, evidence of any aspect of defendant's "character or record" as a basis for a sentence less than death (see § 190.3, factor (k)).[9] In the challenged portion of his summation, the prosecutor argued not that the law prohibited consideration of the defense evidence, but that it was not worthy of consideration because it did not reflect any extraordinary hardships that could excuse or even explain defendant's violent criminality. The argument, a proper one, was that the evidence did not show defendant deserved sympathy, not that sympathy and mercy could not legally be entertained. (*Jackson*, at p. 1241; *People v. Raley* (1992) 2 Cal.4th 870, 917 [8 Cal.Rptr.2d 678, 830 P.2d 712]; *People v. Haskett* (1990) 52 Cal.3d 210, 246 [276 Cal.Rptr. 80, 801 P.2d 323].) For the same reason, we cannot agree with defendant's claim the argument improperly disparaged our legal system.

Defendant also contends the prosecutor misstated the law regarding mitigation and improperly impugned defense counsel's integrity by arguing that the defense, in its penalty phase evidence, "continued to present or portray [defendant] as a victim," just as they had claimed self-defense in the guilt phase, that this constituted an "attempt to distract" the jury from "the real victims of his violent life," and that the jury should "[l]et that disingenuous attempt fall on deaf ears."[10] Again, we believe the argument was proper. An attorney, including a prosecutor, is entitled to point out that the opposing

---

[8] Defendant contends any objection would clearly have been futile in light of the court's overruling of previous objections. But the earlier prosecutorial arguments as to which objections were overruled were on different, if somewhat related, points. (See *post*, fns. 10, 11, 13, and accompanying text.)

[9] Defense counsel, of course, emphasized this point, and the jury was given the standard instruction on section 190.3, factor (k).

[10] A defense objection to this argument as misconduct was immediately overruled, excepting defendant from the requirement he ask the jury to be admonished. (See *People v. Boyette, supra*, 29 Cal.4th at p. 432.)

side is engaging in what the attorney believes to be an attempt to confuse the issues, and may urge the jury to ignore that attempt and focus on the relevant evidence. The prosecutor's admonition to the jury not to be distracted by the defense emphasis on defendant's hardships was neither a misstatement of the law, nor an attack on defense counsel's honesty and integrity, nor an improper appeal to passion. (*People v. Taylor* (2001) 26 Cal.4th 1155, 1166–1167 [113 Cal.Rptr.2d 827, 34 P.3d 937]; *People v. Sanders* (1995) 11 Cal.4th 475, 549–550 [46 Cal.Rptr.2d 751, 905 P.2d 420]; *People v. Gionis* (1995) 9 Cal.4th 1196, 1216–1218 [40 Cal.Rptr.2d 456, 892 P.2d 1199]; *People v. Cummings* (1993) 4 Cal.4th 1233, 1302 & fn. 47 [18 Cal.Rptr.2d 796, 850 P.2d 1].)

Defendant reiterates his misconduct claims with regard to prosecutorial argument aimed at testimony from defendant's family members about the impact a death sentence for defendant would have on them. The prosecutor suggested the defense had "applied guilt" to the jury: "And they tell you . . . this harms his children. This harms his family. This was done to prevent you from doing what is necessary; what is just. This was done to weaken your resolve. This was done to weaken your commitment to justice and the right thing. Whatever you choose, whatever penalty you choose, ensure that you follow the law and that you do justice. Whatever you choose, do not decide this case because someone tries to make you feel guilty." Defendant's appellate claim of misconduct in this regard is forfeited because he failed to object to the argument, but we disagree on the merits as well.

 "We explained in [*People v.*] *Ochoa* [(1998) 19 Cal.4th 353 [79 Cal.Rptr.2d 408, 966 P.2d 442]] that when considering mitigating evidence in determining the penalty, the relevant factor 'is a defendant's background and character—not the distress of his or her family. A defendant may offer evidence that he or she is loved by family members or others, and that these individuals want him or her to live. But this evidence is relevant because it constitutes indirect evidence of the defendant's character.' " (*People v. Smithey* (1999) 20 Cal.4th 936, 1000 [86 Cal.Rptr.2d 243, 978 P.2d 1171].) The evidence in the present case was admitted, and the prosecutor did not argue it could not be considered to the extent it reflected on defendant's character. The prosecutor did not improperly appeal to passion and prejudice, did not misstate the law of mitigation, and did not denigrate defense counsel in arguing that the jury should not decide penalty on the basis of "guilt" over the distress a death sentence would cause defendant's family, but should instead follow the law and do justice.

After reviewing evidence of defendant's violent conduct in custody, the prosecutor argued it showed the danger of giving defendant a life sentence: "We cannot put him in a cage somewhere and put him in a hole and never

feed him and never have anyone come in contact with him. . . . He will be with other inmates. He will have contact with other jail deputies. He will have contact with doctors, nurses, all the types of people that live or work in the Department of Corrections. . . . Those people are all mothers and fathers and grandfathers and sons—[11]. . . . None of these people deserve the pain or suffering that the defendant is capable of inflicting. . . . Life without possibility of parole will afford him an opportunity—an opportunity—to harm others. . . . He'll be free to do whatever he wants in prison, to inflict whatever pain he so desires. As we know, this violence must end. It must stop. . . . And there is only one punishment that can accomplish that."

" '[W]e have never held that in closing argument a prosecutor may not comment on the possibility that if the defendant is not executed he or she will remain a danger to others. Rather, we have concluded that the prosecutor may make such comments when they are supported by the evidence.' " (*People v. Michaels* (2002) 28 Cal.4th 486, 540–541 [122 Cal.Rptr.2d 285, 49 P.3d 1032], quoting *People v. Champion* (1995) 9 Cal.4th 879, 940 [39 Cal.Rptr.2d 547, 891 P.2d 93]; accord, *People v. Ray* (1996) 13 Cal.4th 313, 353 [52 Cal.Rptr.2d 296, 914 P.2d 846].) In the present case, there was ample evidence in aggravation showing defendant had committed violent assaults on jail personnel and fellow inmates alike. The prosecutor was entitled to urge the jury to extrapolate from that evidence to what defendant's behavior was likely to be in state prison if given a life sentence.[12] The argument neither went beyond the evidence nor improperly appealed to passion and prejudice.

Finally, defendant contends the prosecutor committed misconduct in arguing that he was "less deserving of leniency" because the evidence did not show he killed Miller while under the influence of an extreme mental or emotional disturbance (§ 190.3, factor (d)) or that Miller participated in or consented to the homicidal conduct (*id.*, factor (e)).[13] Again, we disagree. The prosecutor clearly explained that factors (d) and (e) were "mitigating factors" and that consequently their absence "does not change to aggravating circumstances" and "does not aggravate this particular crime or aggravate towards the punishment of death," but merely shows "the defendant is less

---

[11] At this point, defense counsel objected to the argument as misconduct; her objection was immediately overruled. (See *People v. Boyette, supra,* 29 Cal.4th at p. 432.)

[12] Defendant observes there was no evidence of the conditions under which he would be held if given a life sentence. The prosecutor nonetheless could reasonably argue that defendant could not be kept in complete isolation for his entire life and would therefore pose a threat to, for example, medical personnel. Nor is it relevant to this claim that, as defendant points out, the jury asked a question during deliberations about the relative conditions of confinement for life prisoners and those on death row. The prosecutor's argument went not to the desirability of housing defendant on death row, but to the appropriateness of a death sentence.

[13] Defense counsel objected to both remarks as misstatements of the law, but her objections were immediately overruled. (See *People v. Boyette, supra,* 29 Cal.4th at p. 432.)

deserving of leniency" than if the factors were present. This was not, as defendant claims, a misstatement of the law. (See *People v. Crittenden* (1994) 9 Cal.4th 83, 148–149 [36 Cal.Rptr.2d 474, 885 P.2d 887]; *People v. Rodriguez* (1986) 42 Cal.3d 730, 788–789 [230 Cal.Rptr. 667, 726 P.2d 113].)

With regard to emotional disturbance, the prosecutor argued the killing of Miller "had nothing to do with" extreme disturbance but was "quite simply for robbery purposes." The prosecutor did not argue that a mental or emotional disturbance could not mitigate the crime unless it qualified as "extreme." Indeed, shortly thereafter the prosecutor acknowledged that, under the law, "[a]ny other circumstance which extenuates the gravity of the crime" could be considered in mitigation. (§ 190.3, factor (k).) The argument thus did not contravene factor (k)'s permission to consider any mitigating circumstance of the crime.

For the reasons above, we conclude the prosecutor, in penalty phase argument, did not use deceptive or reprehensible methods in violation of California law, or by his remarks render the penalty trial unfair or unreliable in violation of the Eighth and Fourteenth Amendments to the United States Constitution. (See *People v. Hill* (1998) 17 Cal.4th 800, 819 [72 Cal.Rptr.2d 656, 952 P.2d 673].)

### 2. *Exclusion of Testimony Offered in Mitigation*

Defendant contends the court's exclusion of certain proposed testimony from his sister, Georgeann Demetrulias, and a friend, Jackie Bridgewater, violated his constitutional right to have the jury consider all relevant mitigating evidence. (*Skipper v. South Carolina* (1986) 476 U.S. 1, 4 [90 L.Ed.2d 1, 106 S.Ct. 1669]; *Eddings v. Oklahoma* (1982) 455 U.S. 104, 112–114 [71 L.Ed.2d 1, 102 S.Ct. 869].)

### *Georgeann Demetrulias*

Defendant complains first that Georgeann Demetrulias was precluded from testifying that when they were young, their mother Tula told defendant he was of little value. The nature and purpose of this testimony, however, was not made clear at the time of the exclusion; we therefore could not reverse on this ground even if we concluded the evidence was admissible and its exclusion caused a miscarriage of justice. (Evid. Code, § 354, subd. (a); see *People v. Whitt* (1990) 51 Cal.3d 620, 647–650 [274 Cal.Rptr. 252, 798 P.2d 849].)

The entire exchange involving this evidence was as follows:

"Q (by [defense counsel]): Did your mom tell Greg and the kids at times—

"[The prosecutor]: Objection hearsay.

"The Court: Sustained.

"Q: Were you told that you were of little value by your mother?'

"[The prosecutor]: Objection. Hearsay.

"The Court: Sustained."

We may assume that defense counsel's first question, had it been completed, would have been whether Tula had told defendant and his siblings they "were of little value." But this assumption is based on counsel's *second* question, which of course had not yet been asked when the court sustained the hearsay objection to the first question. Although defendant now argues the witness's answer to the first question would have been relevant and admissible for a nonhearsay purpose (showing that Tula told defendant he was worthless, not that Tula's statement was true), the trial court could not know that at the time because counsel did not tell the court what her complete question was and what answer she expected the witness to give. For all the trial court could tell, the question called for a hearsay answer. (Evid. Code, § 354, subd. (a); *People v. Fauber* (1992) 2 Cal.4th 792, 854 [9 Cal.Rptr.2d 24, 831 P.2d 249].)[14]

Even assuming error, exclusion of this testimony in mitigation was harmless beyond a reasonable doubt. (See *People v. Fudge* (1994) 7 Cal.4th 1075, 1117–1118 [31 Cal.Rptr.2d 321, 875 P.2d 36].) The witness had already testified that Tula was a strong disciplinarian with a violent temper, that when she had been drinking she gave the children the impression they "really couldn't do anything right," and that she told them she "never wanted to have kids" and they were "the biggest mistake she ever made." There is no reasonable possibility the penalty verdict would have been affected had Georgeann additionally testified Tula told the children they were of little value.

Second, defendant contends the trial court erroneously excluded testimony by Georgeann that "it is hard for the family to be together." The record,

---

[14] Counsel's second question suggested the nonhearsay purpose, but it called for irrelevant evidence, as what Tula told *Georgeann* was not relevant to defendant's background and character.

however, reflects that Georgeann *did* so testify, without objection. She said that each of the Demetrulias children had "made a decision about abandonment, and we all went away" and that *"none of us can even be with each other."* To counsel's further question, *"It's hard for the family to be together even now?"* the witness answered, "Yes." She then (without any further question being asked) repeated that they had all gone their own ways, adding that "it was just very painful." An objection to her attempted further statement of what happened "even today when we get together" was sustained on the basis of nonresponsiveness. The record does not show, and the trial court could not have known, what the witness was going to say happened when the family gets together. As she had already answered, affirmatively, the question of whether it was hard for them to be together, the continued testimony did appear nonresponsive and the objection was properly sustained. More important, the testimony defendant complains was excluded was actually admitted.

### Jackie Bridgewater

Jackie Bridgewater, who described defendant as "like a son" to her, testified that defendant came to her house on January 10, 1989, looking pale and ill, and that she called a number of agencies (including a psychiatric hospital) trying, unsuccessfully, to get him immediate help. To defense counsel's question, "What kind of mental state was he in?" the court sustained the prosecutor's objection of "calls for speculation." To defense counsel's next question, "Can you describe his behavior?" Bridgewater answered: "He cried and hung on to me, and asked me for help. He said that he——." The prosecutor's hearsay objection, interposed at that point, was sustained. Defendant complains both rulings deprived him of relevant mitigating evidence.

As defendant did not make an offer of proof, the record does not show what answer Bridgewater would have given about his mental state. Even if we found prejudicial error, therefore, we could not reverse on this ground. (Evid. Code, § 354, subd. (a); see *People v. Whitt, supra,* 51 Cal.3d at pp. 647–650.) On appeal, defendant suggests Bridgewater would have testified he was "disturbed." This would have added little if anything to Bridgewater's testimony that defendant "cried and hung on to me, and asked me for help" and that she called a psychiatric hospital on his behalf. Its exclusion, even if error, was harmless beyond a reasonable doubt. (*People v. Fudge, supra,* 7 Cal.4th at pp. 1117–1118.)

The prosecutor correctly objected on hearsay grounds to Bridgewater's testimony that defendant "said that he——." The continued answer was also nonresponsive to counsel's question about defendant's behavior. Again, we

cannot tell from the record what Bridgewater would have said. To the extent she would have narrated defendant's "pleas for help," as he claims on appeal, the evidence might have been admissible for a nonhearsay purpose, but would have added little if anything to her testimony that defendant "asked me for help."

Later, Bridgewater testified without objection that she had gotten to know the Demetrulias family better "over the past year or so" and that they were not "a normal family." The prosecutor's relevance objections were sustained, however, to a series of related questions regarding Bridgewater's recent observations of the family. The same objection was sustained to defense counsel's question, "Has his mom told you that she used to beat the heck out of the kids?" Finally, a relevance objection was sustained to counsel's question, "Did you see a lot of kids in the neighborhood ultimately on drug-related problems?" Defendant complains these rulings deprived him of relevant mitigating evidence.

Defendant failed at trial, and still fails, to explain how Bridgewater's observations of the state of his family in the year or so before trial were relevant to his character or record; the trial court's rulings on this series of questions appear correct. Similarly, defendant failed at the time, and still fails, to explain the relevance of general testimony about drug use in the neighborhood. Whether defendant's mother beat "the kids" does appear relevant, assuming defense counsel's question referred to a time when defendant was among "the kids" at home, but the question clearly called for hearsay. Contrary to defendant's suggestion, his mother's supposed declaration was not within the exception for statements against interest (Evid. Code, § 1230), as she was by no means unavailable as a witness. She in fact testified for the defense in the penalty phase, but defense counsel chose not to ask her whether she had beaten her children.

In any event, the proposed testimony was largely cumulative of other evidence. Georgeann Demetrulias testified to their mother's abuse of her children and to the current difficulties of the family. Another neighbor testified that drugs had caused problems for many families in the neighborhood. Even if error, exclusion of additional proposed testimony along these lines was harmless beyond a reasonable doubt. (*People v. Fudge, supra,* 7 Cal.4th at pp. 1117–1118.)

### 3. *Prohibition on Defense Use of Chart in Jury Argument*

In closing argument, defense counsel proposed to use an illustrative chart stating, among other things, that the jury "[m]ust vote for LWOP if mitigation and aggravation are equal." The trial court ruled the chart could not be used

because "when you start telling [a penalty jury] what they 'must' do, that's inappropriate." Defendant contends this ruling violated state law and his federal constitutional rights to counsel, due process, and a reliable penalty hearing.

We have repeatedly approved penalty phase instructions telling the jurors that to return a death verdict they must each be persuaded "that the aggravating circumstances are so substantial in comparison with the mitigating circumstances that it warrants death instead of life without parole." (See, e.g., *People v. Sakarias, supra,* 22 Cal.4th at pp. 637–639; *People v. Raley, supra,* 2 Cal.4th at pp. 919–920.) The jury in the present case was so instructed. (CALJIC No. 8.88 (1989 rev.).)

Defendant argues it follows from the principle expressed in this approved instruction that when the aggravating and mitigating circumstances are of equal weight, the jury must vote for life rather than death. As he puts it, "the words 'so substantial in comparison' [must] mean, at a minimum, 'greater than.'" For this reason, he contends, the precluded chart stated the law correctly and should have been allowed.

We addressed related contentions in *People v. Hayes* (1990) 52 Cal.3d 577, 643 [276 Cal.Rptr. 874, 802 P.2d 376] (*Hayes*), *People v. Samayoa, supra,* 15 Cal.4th at pages 852–853 (*Samayoa*), and *People v. Smith* (2005) 35 Cal.4th 334, 370 [25 Cal.Rptr.3d 554, 107 P.3d 229] (*Smith*). In *Hayes,* we rejected the claim that the jury should have been instructed "what to do if it found the circumstances in aggravation and mitigation to be precisely equal in weight." (*Hayes,* at p. 643.) No such instruction was needed or proper, we held, "[b]ecause the determination of penalty is essentially moral and normative . . . . The jurors cannot escape the responsibility of making the choice by finding the circumstances in aggravation and mitigation to be equally balanced and then relying on a rule of law to decide the penalty issue." (*Ibid.,* citations omitted.)

In *Samayoa,* we approved an instruction stating that the law "'expresses no preference as to which punishment is appropriate.'" (*Samayoa, supra,* 15 Cal.4th at p. 852.) Relying on *Hayes,* and rejecting the defendant's reliance on the standard instruction's "so substantial" language, we held that "neither death nor life is presumptively appropriate or inappropriate under any set of circumstances, but in all cases the determination of the appropriate penalty remains a question for each individual juror." (*Samayoa,* at p. 853.)

More recently, in *Smith,* we observed that CALJIC No. 8.88, by instructing the jury to choose death only if the aggravating circumstances were "so substantial" in relation to the mitigating circumstances as to warrant that

penalty, "convey[ed] to the jury that a life sentence is mandatory if aggravation does not outweigh mitigation." (*Smith, supra,* 35 Cal.4th at p. 370.) Partly on this basis, we rejected the defendant's claim of instructional error. (*Ibid.*)

Defendant's theoretical position, that the principle embodied in CALJIC No. 8.88 implied that a jury must vote for life if it finds the aggravating and mitigating circumstances in equipoise, is consistent with *Smith*'s analysis but seemingly inconsistent with that in *Samayoa.* But even if, as defendant contends, *Samayoa* and *Hayes* are distinguishable as involving instructions rather than argument, we find no prejudicial error in the court's precluding defense counsel's use of a chart. Although counsel was not permitted to use the chart, she *was* allowed to argue the principle involved, that jurors should vote for life if they found the aggravating and mitigating circumstances of equal weight. Without objection, counsel told the jury that "You could find that the factors are equal, and the appropriate penalty is life without possibility of parole." She further argued, without objection, that "[u]nless you find that the factors in aggravation substantially outweigh the factors in mitigation, you don't even reach the decision about whether you should impose the death penalty." Counsel thus told the jury that equally weighted mitigation and aggravation must lead to a verdict of life without possibility of parole. No possibility of prejudice, even under the standard of *Chapman v. California, supra,* 386 U.S. at page 24, arose from the ruling preventing counsel from using a chart to make the same point.

### 4. *Admission of Wissel Victim Impact Evidence*

Over a defense objection, the trial court admitted evidence of the effect defendant's attack had on Clarence Wissel's physical and mental condition. Defendant contends the evidence was not properly admitted under section 190.3, factor (b) (violent criminal activity) because evidence of Wissel's condition "does not bear on the question of whether or not a crime was committed." As we have held, however, the circumstances of the uncharged violent criminal conduct, including its direct impact on the victim or victims of that conduct, are admissible under factor (b). (*People v. Holloway* (2004) 33 Cal.4th 96, 143 [14 Cal.Rptr.3d 212, 91 P.3d 164]; *People v. Mendoza* (2000) 24 Cal.4th 130, 185–186 [99 Cal.Rptr.2d 485, 6 P.3d 150].)

Because a penalty phase jury " 'may consider evidence of other crimes only when the commission of such crimes is proved beyond a reasonable doubt' " (*People v. Robertson* (1982) 33 Cal.3d 21, 53 [188 Cal.Rptr. 77, 655 P.2d 279]), defendant also contends the jury should have been instructed to decide whether the impact on Wissel had been proven beyond a reasonable

doubt. But he cites nothing suggesting that the penalty jury must find beyond a reasonable doubt every factual circumstance of an offense shown under section 190.3, factor (b), including its impact. The jurors here were properly instructed that they could consider defendant's assault on Wissel by force likely to cause great bodily injury as an aggravating circumstance only if they were persuaded beyond a reasonable doubt that defendant "did in fact commit such criminal acts." (CALJIC No. 8.87 (1989 rev.).) No other instruction was required.[15]

### 5. *Cumulative Prejudice from Guilt and Penalty Phase Errors*

We have not found any errors based on defendant's penalty phase contentions, but have in one instance assumed error and found it harmless beyond a reasonable doubt. (*Ante*, pt. 3 [preclusion of use of chart in argument].) Any adverse effect attributable to this assumed error did not tend to aggregate with any adverse effects from assumed guilt phase errors, as the issues are not related to one another. We thus can see no possible accumulation of harms amounting to prejudice, even assuming error.

### 6. *Lack of a Beyond a Reasonable Doubt Burden of Proof Requirement*

Defendant contends California's death penalty law is unconstitutional in that it does not require the penalty phase jury to find beyond a reasonable doubt that individual aggravating factors exist, that the aggravating factors substantially outweigh the mitigating ones, or that death is the appropriate penalty. We have repeatedly rejected these contentions (see, e.g., *People v. Snow* (2003) 30 Cal.4th 43, 126 [132 Cal.Rptr.2d 271, 65 P.3d 749]; *People v. Kipp* (2001) 26 Cal.4th 1100, 1137 [113 Cal.Rptr.2d 27, 33 P.3d 450]), and defendant does not persuade us to reconsider our previous rulings. We adhere to the principle that the assessment of aggravating and mitigating circumstances required of California penalty jurors is inherently " 'normative, not factual' [citation] and, hence, not susceptible to a burden of proof quantification." (*People v. Hawthorne* (1992) 4 Cal.4th 43, 79 [14 Cal.Rptr.2d 133, 841 P.2d 118].)

---

[15] Because we hold the disputed evidence was properly admitted under section 190.3, factor (b), we do not address defendant's claim that erroneous admission of the evidence was prejudicial because it "produced a constitutional violation under the Eighth Amendment." Regarding the need for proof beyond a reasonable doubt, defendant cites *Apprendi v. New Jersey* (2000) 530 U.S. 466 [147 L.Ed.2d 435, 120 S.Ct. 2348] (*Apprendi*) for the proposition that all facts supporting a sentence of death had to be submitted to the jury and found beyond a reasonable doubt. As discussed below (see *post*, pt. 6), the principles of *Apprendi* and its progeny do not apply to the use of aggravating factors in a California penalty trial. (*People v. Anderson* (2001) 25 Cal.4th 543, 589–590, fn. 14 [106 Cal.Rptr.2d 575, 22 P.3d 347].)

With regard to proof of aggravating factors, defendant relies on *Apprendi, supra,* 530 U.S. 466, and *Ring v. Arizona* (2002) 536 U.S. 584 [153 L.Ed.2d 556, 122 S.Ct. 2428]. These decisions are inapposite for reasons previously explained: " '[U]nder the California death penalty scheme, once the defendant has been convicted of first degree murder and one or more special circumstances has been found true beyond a reasonable doubt, death *is* no more than the prescribed statutory maximum for the offense; the only alternative is life imprisonment without possibility of parole. (§ 190.2, subd. (a).) Hence, facts which bear upon, but do not necessarily determine, which of these two alternative penalties is appropriate do not come within the holding of *Apprendi.*' [(*People v. Anderson, supra,* 25 Cal.4th at pp. 589–590, fn. 14.)] The high court's recent decision in *Ring v. Arizona, supra,* 536 U.S. 584 [122 S.Ct. 2428, 153 L.Ed.2d 556] does not change this analysis. Under the Arizona capital sentencing scheme invalidated in *Ring,* a defendant convicted of first degree murder could be sentenced to death if, and only if, the trial court first found at least one of the enumerated aggravating factors true. (*Id.* at p. 603 [122 S.Ct. at p. 2440].) Under California's scheme, in contrast, each juror must believe the circumstances in aggravation substantially outweigh those in mitigation, but the jury as a whole need not find any one aggravating factor to exist. The final step in California capital sentencing is a free weighing of all the factors relating to the defendant's culpability, comparable to a sentencing court's traditionally discretionary decision to, for example, impose one prison sentence rather than another. Nothing in *Apprendi* or *Ring* suggests the sentencer in such a system constitutionally must find any aggravating factor true beyond a reasonable doubt." (*People v. Snow, supra,* 30 Cal.4th at p. 126, fn. 32.)

### 7. *Lack of a Jury Unanimity Requirement*

For essentially the same reasons we rejected the previous claim, we also disagree with defendant that our statute is unconstitutional because it does not require jurors to agree unanimously on the existence of particular factors in aggravation. (Accord, e.g., *People v. Boyette, supra,* 29 Cal.4th at p. 466; *People v. Hardy* (1992) 2 Cal.4th 86, 214 [5 Cal.Rptr.2d 796, 825 P.2d 781].) While all the jurors must agree death is the appropriate penalty, the guided discretion through which jurors reach their penalty decision must permit each juror individually to assess such potentially aggravating factors as the circumstances of the capital crime (§ 190.3, factor (a)), prior felony convictions (*id.,* factor (c)), and other violent criminal activity (*id.,* factor (b)), and decide for him- or herself "what weight that activity should be given in deciding the penalty." (*People v. Ghent* (1987) 43 Cal.3d 739, 774 [239 Cal.Rptr. 82, 739 P.2d 1250].) The series of normative judgments involved in deciding whether a particular circumstance is indeed aggravating and, if so, what weight it should be given, cannot be fitted into a scheme of unanimous jury factfinding. Defendant's contention is premised on a "misunderstand[ing] [of]

the penalty determination process." (*People v. Miranda* (1987) 44 Cal.3d 57, 99 [241 Cal.Rptr. 594, 744 P.2d 1127].)

### 8. *Refusal of Lingering Doubt Instruction*

The trial court refused defendant's proposed instruction on lingering doubt, which read as follows: "Each individual juror may consider as a mitigating factor residual or lingering doubt as to whether the defendant committed first degree murder. 'Lingering or residual doubt' is defined as the state of mind between beyond a reasonable doubt and beyond all possible doubts. Thus if any individual juror has a lingering or residual doubt about whether the defendant is guilty of first degree murder and the special circumstances are true, he or she must consider this as a mitigating factor and assign it the weight you deem appropriate."[16] The court nonetheless observed that the defense could argue lingering doubt as a mitigating circumstance under section 190.3, factor (k), and defense counsel subsequently did so, reading the proposed instruction's first two sentences to the jury as a "definition" of lingering doubt.

As we have previously held, "[t]here is no constitutional entitlement to instructions on lingering doubt." (*People v. Earp* (1999) 20 Cal.4th 826, 903 [85 Cal.Rptr.2d 857, 978 P.2d 15].) Instructions to consider the circumstances of the crime (§ 190.3, factor (a)) and any other circumstance extenuating the gravity of the crime (*id.*, factor (k)), together with defense argument highlighting the question of lingering or residual doubt, suffice to properly put the question before the penalty jury. (*Earp*, at p. 904.) Defendant presents no persuasive argument to the contrary.

### 9. *Unconstitutionality of California's Death Penalty Law*

Defendant contends several features of California's capital sentencing scheme violate the United States Constitution, both in general and as applied in his trial. For reasons largely explained in previous decisions, we disagree.

"Use of the word 'extreme' in section 190.3, factor[] (d) . . . does not impermissibly restrict the jury's consideration of mitigating factors." (*People v. Smith* (2003) 30 Cal.4th 581, 642 [134 Cal.Rptr.2d 1, 68 P.3d

---

[16] The trial court did not state a reason for refusing the instruction other than that it was not required, but the court's comments regarding the defense's use of a chart in argument (see *ante*, pt. 10) suggest the court was properly wary of telling penalty jurors they "must" reach a particular verdict or consider a particular factor. (See *People v. Snow, supra*, 30 Cal.4th at p. 125 [finding no authority that jurors "must" consider lingering doubt]; *People v. Kaurish* (1990) 52 Cal.3d 648, 705–706 [276 Cal.Rptr. 788, 802 P.2d 278] [approving lingering doubt instruction that said only that such doubt "may" be considered].)

302].) The jury's consideration of prior unadjudicated criminal conduct under section 190.3, factor (b) does not render the statute's use unconstitutional. (*People v. Gray* (2005) 37 Cal.4th 168, 236 [33 Cal.Rptr.3d 451, 118 P.3d 496]; *People v. Hillhouse* (2002) 27 Cal.4th 469, 507 [117 Cal.Rptr.2d 45, 40 P.3d 754].)

California homicide law and the special circumstances listed in section 190.2 adequately narrow the class of murderers eligible for the death penalty, and the existence of prosecutorial discretion to seek the death penalty in a death-eligible case does not render the imposition of the penalty unconstitutionally arbitrary and capricious. (*People v. Stitely* (2005) 35 Cal.4th 514, 573 [26 Cal.Rptr.3d 1, 108 P.3d 182]; *People v. Snow, supra,* 30 Cal.4th at pp. 125–126.)

Our statute "is not invalid for failing to require (1) written findings or unanimity as to aggravating factors, (2) proof of all aggravating factors beyond a reasonable doubt, (3) findings that aggravation outweighs mitigation beyond a reasonable doubt, or (4) findings that death is the appropriate penalty beyond a reasonable doubt." (*People v. Snow, supra,* 30 Cal.4th at p. 126.) Generally, no instruction on burden of proof is required in a California penalty trial. (*People v. Gray, supra,* 37 Cal.4th at p. 236.)

The terms "aggravating" and "mitigating" are not vague or ambiguous and do not require definition in the jury instructions. (*People v. Williams* (1997) 16 Cal.4th 153, 267 [66 Cal.Rptr.2d 123, 940 P.2d 710].) In any event, the court here *did* define the terms, using CALJIC No. 8.88 (1989 rev.), and defendant does not criticize the definitions given.

Instructions on the meaning of a sentence of life imprisonment without the possibility of parole and on the "presumption of life" were not constitutionally required. (*People v. Gray, supra,* 37 Cal.4th at p. 237; see *People v. Stitely, supra,* 35 Cal.4th at p. 573; *People v. Snow, supra,* 30 Cal.4th at pp. 123–124; *People v. Arias* (1996) 13 Cal.4th 92, 172–173 [51 Cal.Rptr.2d 770, 913 P.2d 980].)

"International law does not compel the elimination of capital punishment in California." (*People v. Snow, supra,* 30 Cal.4th at p. 127.) Defendant's argument that the use of capital punishment "as *regular punishment* for substantial numbers of crimes" violates international norms of human decency and hence the Eighth Amendment to the United States Constitution fails, at the outset, because California does not employ capital punishment in

such a manner. The death penalty is available only for the crime of first degree murder, and only when a special circumstance is found true; furthermore, administration of the penalty is governed by constitutional and statutory provisions different from those applying to "regular punishment" for felonies. (E.g., Cal. Const., art. VI, § 11; §§ 190.1–190.9, 1239, subd. (b).)

"Comparative intercase proportionality review by the trial or appellate courts is not constitutionally required." (*People v. Snow, supra*, 30 Cal.4th at p. 126; accord, e.g., *People v. Gray, supra*, 37 Cal.4th at p. 237; *People v. Stitely, supra*, 35 Cal.4th at p. 574.)

Citing Justice Blackmun's concurring opinion in *Sawyer v. Whitley* (1992) 505 U.S. 333, 357–360 [120 L.Ed.2d 269, 112 S.Ct. 2514], his dissent from denial of certiorari in *Callins v. Collins* (1994) 510 U.S. 1141 [127 L.Ed.2d 435, 114 S.Ct. 1127], and this court's decision in *In re Clark* (1993) 5 Cal.4th 750 [21 Cal.Rptr.2d 509, 855 P.2d 729], defendant contends the procedural barriers to habeas corpus relief in state and federal courts have rendered the postconviction review of capital sentences unconstitutionally arbitrary and unreliable. Defendant's generalized complaints about the difficulty of obtaining relief on habeas corpus are premature in this direct appellate proceeding and, to the extent they concern the federal courts, are directed to the wrong tribunal as well.

Citing Judge Noonan's dissenting opinion in *Jeffers v. Lewis* (9th Cir. 1994) 38 F.3d 411, 425–427, defendant contends that the administration of California's death penalty suffers from the same arbitrariness perceived by Judge Noonan in Arizona's system, and in particular that the "backlog of death cases in state courts . . . truncates the review eventually provided" and renders impermissibly arbitrary "the ultimate selection of who lives and who dies."

In *People v. Snow*, we rejected a similar contention, based on the same dissenting opinion, that California's pace of execution, slow in comparison to the number of death judgments, makes our system arbitrary. We explained: "The federal appellate court has rejected this argument (*Woratzeck v. Stewart* (9th Cir. 1997) 118 F.3d 648, 652); we do so as well. 'If Woratzeck's death sentence does not violate the Eighth Amendment, then neither does the scheduling of his execution. Arizona must establish some order of execution. There has been no prima facie showing that this scheduling violates the Eighth Amendment.' (*Ibid.*) The same is true here. Defendant does not face imminent execution and can hardly claim he is being singled out for either quick or slow treatment of his appeal and habeas corpus proceedings. More

generally, defendant makes no showing that the number of condemned prisoners executed in California, or the order in which their execution dates are set, is determined by any invidious means or method, with discriminatory motive or effect, or indeed according to anything other than the pace at which various defendants' appeals and habeas corpus proceedings are concluded, a matter by no means within the sole control of the state." (*People v. Snow, supra*, 30 Cal.4th at p. 127.) Defendant presents nothing to prompt reevaluation of that view.

The claimed flaws in our state's death penalty statute identified by defendant, whether considered individually or together, do not make it unconstitutional.

### 10. *Delay Inherent in Capital Appellate System*

"Defendant contends that the delay in appointing appellate counsel and hearing this automatic appeal (from the judgment in [May 1995] to the present) deprived him of due process, and that his execution after such delay would serve no legitimate penological purpose and would therefore violate the Eighth Amendment to the United States Constitution. We have rejected substantially identical contentions in several recent cases (*People v. Ochoa* (2001) 26 Cal.4th 398, 462–464 [110 Cal.Rptr.2d 324, 28 P.3d 78]; *People v. Anderson, supra*, 25 Cal.4th at pp. 605–606; *People v. Frye* [(1998)] 18 Cal.4th [894,] 1030–1031 [77 Cal.Rptr.2d 25, 959 P.2d 183]) and find no cause to reconsider those decisions here." (*People v. Snow, supra*, 30 Cal.4th at p. 127; accord, *People v. Dunkle* (2005) 36 Cal.4th 861, 942 [32 Cal.Rptr.3d 23, 116 P.3d 494]; *People v. Massie* (1998) 19 Cal.4th 550, 574 [79 Cal.Rptr.2d 816, 967 P.2d 29]; *People v. Hill* (1992) 3 Cal.4th 959, 1014–1016 [13 Cal.Rptr.2d 475, 839 P.2d 984].) In particular, we have previously explained the reasons for rejecting defendant's claim (made in reliance on decisions of foreign courts) that a prolonged wait for execution is itself cruel treatment precluding subsequent execution. (See *Frye*, at pp. 1030–1031.)

### 11. *Unconstitutional Methods of Execution*

Defendant contends that both the administration of lethal gas and lethal injection, the two execution methods authorized by section 3604, violate the Eighth Amendment's bar on cruel or unusual punishment. As we have previously held, a challenge to the method of a future execution is not cognizable on appeal because it does not affect the validity of the judgment. (*People v. Snow, supra*, 30 Cal.4th at pp. 127–128; *People v. Holt* (1997) 15 Cal.4th 619, 702 [63 Cal.Rptr.2d 782, 937 P.2d 213].)

## DISPOSITION

The judgment of the superior court is affirmed.

George, C. J., Kennard, J., Baxter, J., Chin, J., Moreno, J., and Corrigan, J., concurred.

Appellant's petition for a rehearing was denied August 30, 2006.