Filed 10/5/23  P. v. Balbuena CA2/8

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## SECOND APPELLATE DISTRICT

## DIVISION EIGHT

| | |
|---|---|
| THE PEOPLE, | B317555 |
| Plaintiff and Respondent, | (Los Angeles County Super. Ct. No. LA090364) |
| v. | |
| CHRISTIAN BALBUENA, | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of Los Angeles County.  Joseph A. Brandolino, Judge.  Affirmed.

Aurora Elizabeth Bewicke, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Susan Sullivan Pithey, Assistant Attorney General, Steven D. Matthews and Ryan M. Smith, Deputy Attorneys General, for Plaintiff and Respondent.

————————————

Christian Balbuena was convicted by a jury of one count of assault with a deadly weapon and one count of robbery, both involving her on-again, off-again boyfriend, Freddy I.  The trial court suspended imposition of sentence and placed appellant on probation for three years.  She appeals from the judgment of conviction, contending the trial court erred in failing to instruct on the lesser included offenses of simple assault and petty theft, abused its discretion in admitting evidence of prior uncharged acts of domestic violence pursuant to Evidence Code section 1109[1], and erred in instructing the jury on how to use and evaluate the prior acts of domestic violence.  We affirm the judgment of conviction.

## BACKGROUND

Appellant and Freddy met at the end of 2017, and at some point thereafter began dating.  There was an eight-year age difference: he was 19 and she was 27.  At first it was a friendly and loving relationship, but after about a year, it changed. Freddy described her behavior as "disrespectful," by which he meant that she said he should not be in the country and deserved to be dead because he was an immigrant, and since he had come to this country alone, it would be easy for her to get rid of him. She told Freddy she had a weapons license and would kill him if he did something wrong or talked to the police.  Freddy stayed in the relationship for another seven months because she threatened him and said if he went with anyone else she would kill him.

---

[1]     Undesignated statutory references are to the Evidence Code.

2

About three months before the charged offenses in this case occurred, the relationship ended but, as Freddy said, "she never left me alone.  She made my life impossible."  Freddy acknowledged, however, that he would still see her for dates in the three months before the incidents; he was trying to work out the problems he was having with her.

On April 16, 2019, appellant texted Freddy and told him to come to the Midtown Inn where she was living.  Freddy drove to the location and parked across the street.  He was finishing some food when he saw appellant get out of the passenger side of a white pickup truck.  He approached appellant and asked her, "Why don't you leave me alone if you . . . have somebody else?"  Appellant did not say anything.  Freddy turned around and went back to his vehicle.  Before he left, took photos of the pickup truck.

After leaving the Midtown Inn, Freddy drove straight home and parked.  As he was parking, the white pickup truck appeared and parked next to the driver's side of Freddy's car.  The driver got out of the truck, followed by appellant.  The driver, later identified as Arturo Pelen, banged three times on Freddy's car window; Freddy perceived this as an attempt to break the window.  Pelen said to return appellant's stuff to her, the stuff that Freddy had taken from her.  Freddy had not taken anything from appellant and did not know what Pelen was talking about.[2]  Freddy got out of his car to resolve the issue.

---

[2]     The parties stipulated that at the preliminary hearing, Freddy testified he took a container of marijuana from appellant but had given her money to buy it.

According to Freddy, once he was out of the car, both appellant and Pelen started hitting him. They said they were going to kill him. They said he was an immigrant and was "worth shit," and they were going to cut him up in pieces and throw him away in Palmdale. Freddy did not fight back; he hunched over and covered his head with his hands. At some point, Pelen got a baseball bat from the truck and hit Freddy over the top of the head with it. Appellant continued to hit Freddy while Pelen was retrieving the bat.

After being hit by the bat, Freddy's head "kind of opened, and it was gushing a lot of blood, and it wouldn't stop." Appellant and Pelen began running back to the truck. Freddy gave somewhat inconsistent accounts of what he said and did at this point. He initially testified that he took out his phone and said that he was going to call the police. After further questioning, on re-cross-examination, he clarified that he was going to call the police, but did not say so out loud.[3]

Appellant then returned, hit Freddy in the head, and took his cell phone from his hand.

Freddy was taken to the hospital, where he received treatment for his head wound. He had internal leakage in his brain. He was in the hospital for three days. At the time of trial, he continued to have headaches and back pain. He suffered from panic attacks and had difficulty recalling numbers, words, and past events.

---

[3] On cross-examination, Freddy had testified he "was pretending that [he] was about to get [his] phone out because [he] was going to call the police." On redirect he testified he did take his phone out.

4

Pelen was apprehended by police a few days after the attack and entered into a plea agreement.

Pelen testified that he and appellant were in a dating relationship on April 16, 2019; Pelen believed it was an exclusive one. They had dinner plans that night. When he arrived at the Midtown Inn to meet appellant, she came down to meet him, but then went back to her room to get something. Freddy then approached the truck and told Pelen that appellant was his girlfriend. Pelen replied that he had been dating appellant for several months. Freddy said he was going to talk to appellant.

When appellant returned to the truck, she was upset and crying, and said Freddy had hit her and had some of her belongings. She told Pelen to drive to Freddy's home.

At Freddy's house, Pelen saw Freddy in his car, approached the car, and demanded that Freddy return appellant's belongings. Freddy responded by cursing and threatening to hurt them if they did not leave.

Appellant then got out of the truck and stood between the two men as they argued. As she tried to hold Pelen back, Freddy came up and punched Pelen in the face. Pelen "just snapped." He got his baseball bat from his truck and hit Freddy in the head with it. Pelen then turned around and headed back to his truck, saying to appellant, "Let's leave."

Freddy said he knew where Pelen lived and was going to kill him.

Appellant then said she would be right back and went toward Freddy. Two minutes later she returned with a cell phone. She told Pelen it was Freddy's phone. Pelen and appellant then went back to the Midtown Inn.

In her defense, appellant called Los Angeles Police Department (LAPD) Detective Noah Stone. Detective Stone spoke with Freddy telephonically a few days after the incident, using one of Freddy's relatives as an interpreter. Detective Stone believed Freddy was in the hospital at the time. Detective Stone remembered Freddy telling him a verbal argument preceded Pelen hitting him with the bat. Freddy did not report that appellant hit him at any time during the incident, including after he was hit with the bat. Freddy told Detective Stone he fell to the ground after being hit with the bat and as he "was retrieving his cell phone to call for assistance, [appellant] took his cell phone from him."

## DISCUSSION

I.  *The Trial Court Committed Harmless Error in Refusing to Instruct the Jury on Petty Theft as a Lesser Included Offense of Robbery.*

Appellant contends the trial court erred in refusing to instruct the jury on petty theft as a lesser included offense of robbery. She contends the trial court erred because it had a sua sponte duty to so instruct and because she requested the instruction as her theory of the case. We agree.

Petty theft is a lesser included offense of robbery. (*People v. Waidla* (2000) 22 Cal.4th 690, 737.) A trial court is required to instruct sua sponte on a lesser included offense whenever it is supported by the sufficient evidence. "[T]he existence of '*any* evidence, no matter how weak' will not justify instructions on a lesser included offense, but such instructions are required whenever evidence that the defendant is guilty only of the lesser offense is 'substantial enough to merit consideration' by the jury.

6

[Citations.] 'Substantial evidence' in this context is ' "evidence from which a jury composed of reasonable [persons] could . . . conclude[ ]" ' that the lesser offense, but not the greater, was committed. [Citations.] [¶] In deciding whether there is substantial evidence of a lesser offense, courts should not evaluate the credibility of witnesses, a task for the jury." (*People v. Breverman* (1998) 19 Cal.4th 142, 162, overruled on another ground by *People v. Schuller (2023*) 15 Cal.5th 237 (*Breverman*); see *People v. Eid* (2010) 187 Cal.App.4th 859, 879 [instruction on defense theory must be given if it is supported by evidence sufficient to raise a reasonable doubt if believed by the jury].)

On appeal, we review de novo the trial court's failure to instruct on a lesser included offense, considering the evidence in the light most favorable to the defendant. (*People v. Millbrook* (2014) 222 Cal.App.4th 1122, 1137.)

Here, as the parties at least implicitly agreed, a reasonable juror could find that the intent to steal was formed after the assault was over, when appellant was walking back to the truck. In this scenario, the force used in the assault would not satisfy the force or fear element of robbery. (See, e.g. *People v. Ramkeesoon* (1985) 39 Cal.3d 346, 351 ["If defendant had not harbored a larcenous intent before or during the assault, the taking was theft rather than robbery. [Citation] Although the jury was not required to believe defendant's testimony, it was credible enough to have supported a verdict of theft instead of robbery."].)

Further, based on Detective Stone's testimony that Freddy reported the cell phone theft but did not report appellant hitting him, a reasonable juror could disbelieve Freddy's testimony that appellant hit him in the face right before taking his phone.

The trial court found an instruction on petty theft was not required because Freddy had the phone in his hand and "there is at least the force necessary to take it out of his hand." Appellant's counsel argued that the phone could be taken from Freddy's hand without force or fear: "If he's holding it in his hand and she takes it, lifts it from his hand, like the taking from the hand is the minimum if you believe it. . . . There is no testimony that the hand was closed or that he gripped the phone." The court replied, "I think when you take it from someone's hand, it's necessarily force."

Appellant's counsel was correct. "Grabbing or snatching property from the hand has often been held to be grand larceny, and not robbery." (*People v. Church* (1897) 116 Cal. 300, 303 [refusal of instruction on lesser offense of larceny not warranted where evidence showed a watch and chain were suddenly grabbed from the vest of its owner, but evidence it was accomplished by force or fear was conflicting].)

Indeed, so prevalent has been the idea that grabbing or snatching property is theft, not robbery, that this District Court of Appeal noted less than 15 years ago that "[t]here may be some generalized impression that a purse snatch—grabbing a purse (or similar object) from a person—is grand theft and nothing more. Thus, it has been said that the purpose of Penal Code section 487 is to 'guard against "the purse-snatcher." ' [Citation.]" (*People v. Burns* (2009) 172 Cal.App.4th 1251, 1257 (*Burns*).)

8

The Court in *Burns* explained that whether a purse snatch qualified as a robbery depended on the force used. (*Burns*, *supra*, 172 Cal.App.4th at p. 1258.) The Court noted that *Church* remains "a leading decision on the issue" of snatching or grabbing property, but cases after *Church* "have discussed the amount of force required for robbery as opposed to grand theft." (*Burns,* at p. 1258) The Court in *Burns* looked to those cases. "In *People v. Morales* [(1975)] 49 Cal.App.3d 134, the court observed that . . . 'it is established that something more is required than just that quantum of force which is necessary to accomplish the mere seizing of the property.' " (*Burns,* at p. 1259.) "An accepted articulation of the rule is that ' "[a]ll the force that is required to make the offense a robbery is such force as is actually sufficient to overcome the victim's resistance." ' " (*Ibid*.) In *People v. Roberts* (1976) 57 Cal.App.3d 782, also discussed in *Burns*, the court found force sufficient for robbery when the handle of the purse was broken by the defendant. (*Id.* at p. 787.) In *Burns* itself, "appellant came up to [the victim] and grabbed the purse she was holding; she tried to hold onto it but his strength and his act in stepping on her foot overcame her resistance, and he got away with the purse. That was robbery, and there is no basis in the record for a jury to find that it was nothing more than grand theft from the person." (*Burns,* at p. 1259.)[4]

---

[4] Appellant also contends that given the inconsistencies in Freddy's testimony, a reasonable juror could have doubted that she took the phone from Freddy's person at all, but could have decided that she took it from the seat of the car or the ground, and thus did not use force or fear to take the phone. Freddy testified that appellant took the phone from his hand. Appellant points out Freddy testified at one point that he only pretended to

"[I]n a noncapital case, error in failing sua sponte to instruct, or to instruct fully, on all lesser included offenses and theories thereof which are supported by the evidence must be reviewed for prejudice exclusively under [*People v. Watson* (1956) 46 Cal.2d 818].  A conviction of the charged offense may be reversed in consequence of this form of error only if, 'after an examination of the entire cause, including the evidence' (Cal. Const., art. VI, § 13), it appears 'reasonably probable' the defendant would have obtained a more favorable outcome had the error not occurred." (*Breverman, supra,* 19 Cal.4th at p. 178.)

Here, we see no reasonable probability that appellant would have obtained a more favorable outcome if a petty theft instruction had been given, or put differently, no reasonable probability that the failure to give the theft instruction affected the outcome.

By convicting appellant of aiding and abetting Pelen's assault with a deadly weapon, the jury indicated that it found Freddy's account of the encounter credible.  Pelen's testimony, if believed, would have shown that appellant attempted to prevent the assault, rather than provide the assistance and encouragement necessary for aiding and abetting.  There was no reason for the jury to believe Freddy's testimony about appellant's conduct during the assault, but disbelieve his

---

take his phone out, but there is no evidence of the phone's location at that point, and it is pure speculation on appellant's part that the phone was inside the car.  Similarly, although Freddy was severely injured, there is no evidence he dropped the phone to the ground at any point; this is simply speculation by appellant.

testimony that appellant hit him, then took his cell phone. Further, Pelen testified that it took appellant about two minutes to go to Freddy and then return to the truck with the cell phone. This is a fairly lengthy amount of time to travel the few feet from the truck to Freddy's car and back again. The elapsed time suggests that appellant did not merely grab the phone from appellant's unresisting hand and walk away; it is more consistent with Freddy's account that appellant hit him and then took the phone.

II. *The Trial Court Did Not Err in Failing to Instruct on Simple Assault as a Lesser Included Offense of Assault with a Deadly Weapon.*

Appellant contends that even when instructions on a lesser included offense would not be warranted for the principal perpetrator, the trial court has a sua sponte duty to instruct on a lesser included offense "if the evidence raises a question whether the greater offense is a reasonably foreseeable consequence of the criminal act originally contemplated and aided, but would support a finding that a lesser included offense committed by the perpetrator was such a consequence." (*People v. Woods* (1992) 8 Cal.App.4th 1570, 1578 (*Woods*).) Appellant claims the evidence supports a theory that she should have reasonably anticipated the encounter she instigated would render some sort of minor touching foreseeable but she may not have reasonably foreseen that her attempts to retrieve her missing property would escalate into an assault with a deadly weapon.

*Woods* involves the natural and probable consequences doctrine, and foreseeability in aiding and abetting liability is relevant only when the prosecutor relies on that doctrine. The doctrine only applies when a defendant intends to aid and abet

11

some crime.  (See, e.g., *People v. Robins* (2020) 44 Cal.App.5th 413, 422 [" 'under the natural and probable consequences doctrine, an aider and abettor is guilty not only of the intended crime, but also "for any other offense that was a 'natural and probable consequence' of the crime aided and abetted." ' "].) Appellant has not clearly identified a target crime which she intended to aid and abet.  She appears to be claiming that she only intended to take the legally permissible action of retrieving her property, and that it was foreseeable that Pelen would commit only a simple assault.  Put differently, she does not argue that she knew Pelen intended to commit simple assault and intended to aid and abet his commission of that crime.

More importantly, the prosecutor did not rely on the natural and probable consequences doctrine and the jury was not instructed on it.  The trial court instructed the jury only on direct aiding and abetting, which required the jury to find that appellant knew of the perpetrator's intent to commit the charged crime and intended to aid and abet the perpetrator's commission of the charged crime.  As the California Supreme Court has made clear, a trial court has a sua sponte duty to instruct on the natural and probable consequences doctrine "only when the prosecution has elected to *rely* on the 'natural and probable consequences' theory of accomplice liability and the trial court has determined that the evidence will support instructions on that theory." (*People v. Prettyman* (1996) 14 Cal.4th 248, 269.) There was no such reliance here.

12

III.    *The Trial Court Did Not Abuse Its Discretion in Admitting Evidence of Prior Uncharged Domestic Violence Incidents Under Section 1109.*

Appellant contends the trial court erred prejudicially in allowing the admission of uncharged past incidents of domestic violence by appellant to prove propensity under section 1109. Alternatively, appellant contends the trial court erred in instructing the jury on the use of that evidence.

A.    <u>*Background and ruling*</u>

On November 3, 2021, during voir dire, the prosecutor filed a motion in limine seeking to admit Freddy's testimony that appellant had threatened and assaulted him in 2020; he had not reported these incidents. The prosecutor contended that these incidents were admissible under section 1109 as evidence of uncharged acts of domestic violence. After a brief hearing that same day on the motion, the trial court indicated it was inclined to admit the evidence under section 1109 if the prosecutor provided more details.

On November 4, 2021, just before Freddy was set to testify, the prosecutor provided an Investigative Action Statement form from the LAPD reporting statements by Freddy. After a hearing, the trial court found the prior incidents involved violence against the same victim and so were relevant. The court also found the charged offenses involved severe injuries and none of the prior uncharged incidents were more egregious, so the prior incidents survived a section 352 analysis. The trial court found the prosecutor complied with the notice requirements of section 1109, because the prosecutor disclosed the specific information as soon

13

as she learned of it.[5]  The court offered to provide the defense with more time to investigate the information in the statement.

Ultimately, the prosecutor asked Freddy if there had been any physical violence in his relationship with appellant before the April 16, 2019 incident.  Freddy testified that about five or six months before the baseball bat attack, appellant appeared at Freddy's house at about 5:00 a.m., poured a cup of coffee over Freddy's head, broke his television, and threw his shoes and other belonging outside.  She also hit him.

In another incident about five months before the baseball bat attack, appellant hit Freddy in his mouth, scratching his face and causing a swollen lip.  She also squeezed his arm so hard it left a mark.  Freddy offered photographs of these injuries.

About two months before the baseball bat attack, appellant picked him up from his house and then when the car sped up, she told him she was going to take him to a place where they would make him disappear.  Freddy wanted to get out of the car, but it was moving and appellant held onto him.  When appellant had to wait before making a left turn, Freddy took the opportunity to get out of the car and flee.  He hid while appellant looked for him.

B.    *Section 352 balancing test*

Section 1109 provides that "evidence of the defendant's commission of other domestic violence is not made inadmissible by Section 1101 if the evidence is not inadmissible pursuant to

---

[5]    The prosecutor suggested the defense was not completely blindsided, because Freddy indicated in the police report that there had been prior incidents and testified at the preliminary hearing that there was some prior abuse or domestic violence.

14

Section 352." (§ 1109, subd. (a)(1).) Appellant contends the trial court abused its discretion in failing to exclude the prior incidents pursuant to section 352, and the admission of this evidence violated her constitutional right to due process.

Section 352 provides: "The court in its discretion may exclude evidence if its probative value is substantially outweighed by the probability that its admission will (a) necessitate undue consumption of time or (b) create substantial danger of undue prejudice, of confusing the issues, or of misleading the jury." (§ 352.)

Appellant attempts to create a "required" five factor analysis for applying the balancing test of section 352, based on the discussion in *People v. Johnson* (2010) 185 Cal.App.4th 520 (*Johnson*). She lists the five factors as 1) similarity of the uncharged acts to the charged offense; 2) corroboration; 3) whether there are convictions for the past acts; 4) strength of the evidence of the defendant's guilt in the current case; and 5) whether the introduction of uncharged conduct will create a danger that the jury will be tempted to punish the defendant because she previously escaped punishment.

We do not read *Johnson* as creating such a mandatory formal analysis. The court in *Johnson* is essentially applying a standard section 352 analysis to the specific facts before it. We find the *Johnson* discussion helpful, but not in the format created by appellant.

Appellant contends the first and primary factor affecting the probative value of an uncharged act of domestic violence is " ' "its similarity to the charged offense." ' " (*Johnson, supra,* 185 Cal.App.4th at pp. 531–532.)

Section 1109 was intended to make admissible a prior incident " 'similar in character to the charged domestic violence crime, and which was committed against the victim of the charged crime or another similarly situated person.' (Assem. Com. on Public Safety, Analysis of Sen. Bill No. 1876 (1995–1996 Reg. Sess.) June 25, 1996, p. 5.)" (*Johnson, supra,* 185 Cal.App.4th at p. 532.)  The legislative history of section 1109 also recognizes that, in domestic violence cases, " '[n]ot only is there a great likelihood that any one battering episode is part of a larger scheme of dominance and control, that scheme usually escalates in frequency and severity.' " (*People v. Johnson* (2000) 77 Cal.App.4th 410, 419.)

Here all the uncharged acts were committed against the same victim by appellant.  For those acts for which Freddy provided details, the acts began with appellant seeking out Freddy, and physical violence took place at Freddy's home.[6] While appellant is correct that these acts are not factually identical to the charged act, they are broadly similar.  More importantly, they display the pattern of escalation characteristic of domestic violence.  They began with threats of violence alone, then escalated to some violence against appellant (the coffee pouring and hitting) then to more serious violence (the hitting resulting in a split lip) then to what Freddy understood as an attempt to kidnap and kill him.  Initially, appellant acted alone, but in the last uncharged act (the kidnapping attempt), she

---

[6]     If hitting resulting in a swollen lip was a separate incident from the coffee pouring, it is not clear where that hitting occurred.

appeared to indicate that she had assistance, telling Freddy that she was going to take him to a place where "they" would make him disappear. Viewed in this light, the charged acts represented a further escalation of domestic violence, involving actual assistance, a weapon, and the infliction of severe injuries. Thus, the uncharged acts constitute exactly the conduct section 1109 was intended to make admissible, in order to prevent further escalation. (See *People v. Johnson, supra,* 77 Cal.App.4th at p. 419 [Quoting legislative history: " 'Without the propensity inference [of section 1109], the escalating nature of domestic violence is likewise masked. . . . Since criminal prosecution is one of the few factors which may interrupt the escalating pattern of domestic violence, we must be willing to look at that pattern during the criminal prosecution' "].)

Corroboration, the second "factor" listed by appellant, is viewed by the Court in *Johnson, supra,* 185 Cal.App.4th at page 533 as part of an assessment of the probative value of the evidence, as discussed in *People v. Ewoldt* (1994) 7 Cal.4th 380. In *Ewoldt*, the Court explained that corroboration increases probative value, but the lack of corroboration is "of limited significance." (*Id.* at pp. 404–405.) Put differently, the lack of corroboration does not, as appellant suggests, weigh strongly against admissibility.

The remaining three "factors" identified by appellant all involve the other side of the section 352 balancing test: the danger of undue prejudice, of confusing the issues, or of misleading the jury.

The lack of a conviction for the prior acts may potentially cause unfair prejudice to the defendant by requiring her "to mount a defense against evidence of a long-past incident."

17

(*Johnson, supra,* 185 Cal.App.4th at p. 533)  Here, the incidents were very recent and  appellant's defense to the uncharged acts was fundamentally and necessarily the same as her defense to the charged acts:  Freddy was not credible.[7]

The lack of a prior conviction can also raise concerns that the jury will be tempted to punish the defendant for past unpunished conduct.  This prejudicial effect is diminished if the evidence of current crime is strong, "for it is less likely the jury will be swayed to convict the defendant based on his past misconduct.  (See *Ewoldt, supra,* 7 Cal.4th at p. 405.)" (*Johnson, supra,* 185 Cal.App.4th at p. 536.)

As the trial court recognized, "whatever the alleged victim says, it's really going to come down to that person's credibility whether or not he throws in these prior incidents."  Thus, the potential prejudice from lack of prior convictions was not present here.  (See *Ewoldt, supra,* 7 Cal.4th at p. 405 ["The testimony describing defendant's uncharged acts, however, was no stronger and no more inflammatory than the testimony concerning the charged offenses.  This circumstance decreased the potential for prejudice, because it was unlikely that the jury disbelieved Jennifer's testimony regarding the charged offenses but nevertheless convicted defendant on the strength of [another victim's] testimony or Jennifer's testimony regarding the uncharged offenses, or that the jury's passions were inflamed by the evidence of defendant's uncharged offenses."].)

---

[7]     There is no indication, for example, that appellant could have called witnesses who were relevant to the uncharged acts as the incidents appear to have taken place in private.

18

IV.    *The Trial Court Committed Harmless Error in Ruling the Prior Domestic Violence Could Be Used Pursuant to Section 1101 to Show an Intent to Permanently Deprive Freddy of His Property.*

During the discussion of jury instructions, the trial court brought up CALCRIM No. 375 and stated: "I indicated background as to the general background, but I think . . . to be more specific for 1101(b), I'll just say motive and intent because I think the prior acts of domestic violence as described by Freddy [as] controlling and abusive conduct . . . arguably . . . could make it more likely that the Defendant meant to take his property or had a motive to commit the offenses against him."[8]  Appellant objected.  Appellant contends the trial court abused its discretion so ruling.

A.    *Intent For Robbery*

We agree with appellant that the prior incidents are not probative of whether she intended to take Freddy's phone. "Evidence of *intent* is admissible to prove that, if the defendant committed the act alleged, he or she did so with the intent that comprises an element of the charged offense." (*Ewoldt, supra,* 7 Cal.4th at p. 394, fn. 2.)  Thus, to be admissible under section 1101, subdivision (b), the uncharged offenses, should " be

---

[8]    We note that respondent contends that the uncharged acts were relevant to show Freddy's state of mind as to why he may have been in fear when appellant stole his cell phone or during the assault.  We do not understand the trial court as making this finding, and it is not reflected in CALCRIM 375 concerning the use of uncharged acts (for purposes other than section 1109).

19

'sufficiently similar [to the charged offenses] to support the inference that the defendant " 'probably harbor[ed] the same intent in each instance.' [Citations.] " ' " (*People v. Kipp* (1998) 18 Cal.4th 349, 371.) The intent required for robbery is the intent to steal. None of the uncharged acts of domestic violence involved the taking of any of appellant's property, and so there is no basis to infer that appellant harbored the same intent to steal in the charged offense of robbery as he did in those prior acts.

The jury learned of the trial court's ruling through CALCRIM No. 375, which told the jury that the uncharged acts could be considered in deciding whether "[t]he defendant acted with the intent to permanently deprive Freddy I. of his property in this case[.]"

We see no reasonable probability that appellant would have received a more favorable outcome in the absence of the instruction on intent. (*People v. Moore* (2011) 51 Cal.4th 1104, 1130 (*Moore*) [applying *Watson* harmless error standard to instructional error; *People v. Falsetta* (1999) 21 Cal.4th 903, 924–925 [applying *Watson* standard to claim error in instructing jury on proper use of propensity evidence].) Pelen testified that after appellant returned to the truck with Freddy's phone, he and appellant drove away. Freddy testified he never got phone back. This is every strong circumstantial evidence that appellant harbored the intent to permanently deprive appellant of his phone, and we see no reasonable probability that appellant would have received a more favorable outcome in the absence of this instruction. Even if the jury believed that appellant was motivated to take the phone from Freddy to prevent him from calling the police, that motivation is in no way inconsistent with an intent to permanently deprive Freddy of the phone.

B. *Motive*

CALCRIM No. 375 also told the jury that it could consider the prior domestic violence incidents for the purposes of deciding whether appellant "had a motive to commit the offenses alleged in this case." We see no abuse of discretion in the admission of the prior acts to show motives for both offenses.

Appellant suggested she pursued and attacked Freddy because he took her belongings. Freddy denied taking any of appellant's belongings. Thus, her motive was at issue. Evidence that she had threatened and assaulted appellant in the past, particularly when he tried to distance himself from her showed that appellant had a motive to control and dominate Freddy, both by assaulting him and taking his phone to prevent him from summoning assistance.

Relying primarily on *People v. Scheer* (1998) 68 Cal.App.4th 1009, appellant contends that the presence of the same motive on two separate occasions may show a common plan or design, but a common manner of committing misconduct does not show a motive to commit the misconduct. Since *Scheer* was decided, the law concerning other crimes evidence to prove motive has been clarified. In general, other crimes evidence "is admissible to establish two different types or categories of motive evidence. In the first category, 'the uncharged act supplies the motive for the charged crime; the uncharged act is cause, and the charged crime is effect.' [Citation.] 'In the second category, the uncharged act evidences the existence of a motive, but the act does not supply the motive. . . . [T]he motive is the cause, and both the charged and uncharged acts are effects. *Both crimes are explainable as a result of the same motive.*' " (*People v. Spector* (2011) 194 Cal.App.4th 1335, 1381 (*Spector*).)

"California case law allows the admission of other crimes evidence to prove this second kind of motive.  (See *People v. Davis* (2009) 46 Cal.4th 539, 604 [94 Cal.Rptr.3d 322, 208 P.3d 78] [evidence of two prior sexual assaults on children involving bondage tended to show defendant had motive for sexually assaulting murder victim]; *People v. Demetrulias* (2006) 39 Cal.4th 1, 15 [45 Cal.Rptr.3d 407, 137 P.3d 229] [evidence of prior assault and robbery of different victim tended to show defendant had motive to rob victim killed in current case]; *People v. Walker* (2006) 139 Cal.App.4th 782, 803 [43 Cal.Rptr.3d 257] [in trial for murdering prostitute, evidence of prior sexual assaults tended to show defendant's ' "common motive of animus against prostitutes resulting in violent batteries interrupting completion of the sex act" ']; *People v. Pertsoni* (1985) 172 Cal.App.3d 369, 375 [218 Cal.Rptr. 350] [in trial for murdering man affiliated with Yugoslav government, evidence defendant had previously shot at person he thought was Yugoslavian ambassador tended to show that defendant's hatred of Yugoslav government impelled him to kill current victim].)" (*Spector, supra,* 194 Cal.App.4th at pp. 1381–1382.)  As the court in *Spector* explained, *Scheer* "acknowledged the legitimacy of category two motive evidence although they characterized it as 'common plan' evidence.  [Citation.]  The problem in *Scheer,* where the defendant was on trial for voluntary manslaughter arising out of a traffic accident, was that there had been only *one* other incident and it was not particularly similar." (*Spector,* at p. 1382, fn. 17.)  That is not a problem here.

Because the trial court did not abuse its discretion in allowing the prior uncharged acts to be considered as evidence of

a motive, CALCRIM No. 375 properly instructed the jury of that permitted use.

V.   *The Trial Court Committed Harmless Error in Giving an Incomplete Version of CALCRIM 852A.*

CALCRIM No. 852A is the standard jury instruction for using prior domestic violence incidents pursuant to section 1109 to show disposition or inclination.  Section 1109 provides: " 'Domestic violence' has the meaning set forth in Section 13700 of the Penal Code.  Subject to a hearing conducted pursuant to Section 352, which shall include consideration of any corroboration and remoteness in time, 'domestic violence' has the further meaning as set forth in Section 6211 of the Family Code, if the act occurred no more than five years before the charged offense."  (§ 1109, subd. (d)(3).)

CALCRIM No. 852A provides both the Penal Code and Family Code definitions as alternative definitions.  The instruction's bench notes state: "If the court determines that the evidence is admissible pursuant to the definition of domestic violence contained in Penal Code section 13700, give the definition of domestic violence labeled alternative A.  If the court determines that the evidence is admissible pursuant to the definition contained in Family Code section 6211, give the definition labeled alternative B.  Give the bracketed portions in the definition of 'abuse' if the evidence is admissible pursuant to Family Code section 6211."  (Judicial Council of Cal., Crim. Jury Instns. (2023) Bench Notes to CALCRIM No. 852A)

The trial court gave the jury an incomplete version of CALCRIM No. 852A.  The instruction as given told the jury that it could consider evidence of prior domestic violence "only if the People have proved by a preponderance of the evidence that the

23

defendant in fact committed the uncharged domestic violence." However, the instruction did not provide any definition of domestic violence nor did it specify the prior acts of domestic violence allegedly committed by appellant.

Appellant did not object to the instruction, and this failure ordinarily forfeits an appellant's state law claims. (*People v. Mitchell* (2019) 7 Cal.5th 561, 579.) We may "review any instruction given, refused or modified, even though no objection was made thereto in the lower court, if the substantial rights of the defendant were affected thereby." (Pen. Code, § 1259; see *Mitchell*, at p. 579.) Appellant contends the instruction violated her right to due process, and this would affect her substantial rights if true. (See *Mitchell,* at p. 579.) As we explain, we do not find that her right to due process was implicated.

Appellant analogizes the requirement that the People prove a defendant committed a prior act which meets the definition of domestic violence to the requirement that the People prove every element of a charged offense. Thus, in her view, the omission of the definition of domestic violence is the equivalent of the omission of an element of a charged offense, violating her right to due process under the state and federal constitutions. (*Carella v. California* (1989) 491 U.S. 263–265 [105 L.Ed.2d 218, 109 S.Ct. 249].)

She offers no legal authority to support this analogy, and no reasoned argument of her own. She simply states: "The fact that the past offenses were not charged should make no difference."

"Every crime consists of a group of essential elements, known as the corpus delecti, that are created by statute or law. [Citation.] These elements define the crime, and each element

24

must be proven to establish an offense." (*People v. Solis* (2020) 46 Cal.App.5th 762, 779.)  In addition, "[a]ny fact that, by law, increases the penalty for a crime is an 'element.' " (*Alleyne v. United States* (2013) 570 U.S. 99, 103 [186 L.Ed.2d 314, 133 S.Ct. 2151].)

CALCRIM No. 852A describes the requirements for admitting prior acts of domestic violence to show propensity under Section 1109.  Section 1109 is a rule of evidence, not a crime.  It does not increase the penalty for a crime.  It simply makes no sense to say that domestic violence is an "element" of section 1109.  Further, there is no crime called "domestic violence" and so it does not have any essential elements of its own.

"Domestic violence" for purposes of section 1109 is not defined by reference to specific statutorily defined crimes.  Penal Code section 13700 refers to categories of misconduct involving "intentionally . . . causing or attempting to cause bodily injury" and "placing another person in reasonable apprehension of imminent serious bodily injury."  (Pen. Code, § 13700, subd. (a).)  Causing bodily injury can include a number of specific crimes, including simple assault, assault with a deadly weapon, and mayhem; each offense has its own set of essential elements.  The Family Code definition of domestic violence is even broader, and includes behaviors which could be enjoined, such as harassing the victim or disturbing his peace.[9]  (Fam. Code, § 6320.)  For both

---

[9] "Family Code section 6211 defines domestic violence to require abuse and Family Code section 6203, subdivision (d) defines 'abuse' to include 'engage[ing] in any behavior that has been or could be enjoined pursuant to Section 6320.' " (*People v.*

25

statutes, the definition of domestic violence does not refer to any specific statutory offenses or list their elements, and nothing in the instruction suggests that the prosecutor must prove that an uncharged prior act satisfies all the elements of a specific offense. Thus, the omission of the definition of domestic abuse did not result in the omission of an element of any statutory offense.

Although we do not agree with her characterization of the error as involving the omission of an element, her claim can be understood more broadly as a claim that the instruction is not correct in law, and for this reason we will assume appellant's failure to object to this instruction at trial did not forfeit her claim on appeal. (See *Moore, supra,* 51 Cal.4th at p. 1130, citing *People v. Kelly* (2007) 42 Cal.4th 763, 791 [a claim that an instruction is not "correct in law" may be raised on appeal despite the failure to object below].)

We agree with appellant that it was error to omit the definition of domestic violence, at least here where the specific acts alleged to be domestic violence are not identified. This creates the potential for a jury to treat non-qualifying conduct as domestic violence. We review this error under the standard in *People v. Watson, supra,* 46 Cal.2d at page 836. (*People v. Falsetta, supra,*) 21 Cal.4th at p. 925 [applying *Watson* standard to error in failing to instruct the jury on how to use the propensity evidence].) We see no reasonable probability of a more favorable outcome if the jury had been instructed on the definition of domestic violence. Put differently, we see no

*Ogle* (2010) 185 Cal.App.4th 1138, 1144.) CALCRIM No. 852A includes in its definition of domestic violence any behavior which could be enjoined pursuant to Family Code section 6320.

reasonable probability that the lack of a definition affected the outcome.

The trial court instructed the jury generally: "Some words or phrases used during this trial have legal meanings that are different from their ordinary meanings in everyday use. These words and phrases will be specifically defined in these instructions. . . . Words and phrases not specifically defined in these instructions are to be applied using their ordinary everyday meanings." Thus, because domestic violence was not defined in CALCRIM No. 852A, the jury would have given the term violence its ordinary everyday meaning of physical force. CALCRIM No. 852A as given reinforces that common meaning by indicating that count 2, the assault charge, is domestic violence.[10] This ordinary meaning is consistent with one type of domestic violence found in the term's formal definition: intentionally causing or attempting to cause bodily injury.

However, domestic violence covers a much broader range of conduct than physical violence. It includes behavior which may be enjoined under Family Code section 6320; that section permits the enjoining of "molesting, attacking, striking, stalking, threatening, sexually assaulting, battering, . . . harassing, telephoning, including, but not limited to, making annoying telephone calls . . . , destroying personal property, . . . or disturbing the peace of the other party." (Fam. Code, § 6320, subd. (a).)

---

[10] Specifically, the instruction states that prior acts may show a disposition or inclination to commit domestic violence and tells the jury it may conclude that the defendant was likely to commit Count 2, thereby indicating that an assault is domestic violence.

27

So, even if the jury did view Freddy's testimony about appellant's non-violent behavior, insults, and threats as domestic violence, this behavior clearly qualified as harassing and threatening Freddy and disturbing his peace. We see no reasonable probability that a properly instructed jury would have found that this conduct was not domestic violence as defined in Family Code sections 6211 and 6320.

Appellant further contends that the instruction did not prevent the jury from using appellant's past insults or her act of throwing Freddy's shoes as proof that she had a propensity for committing robbery. The instruction clearly told the jury that evidence of domestic violence could only be used with respect to count 2, which was the assault charge.

Finally, appellant contends the trial court erred in failing to remove the criticized phrase "and did commit" from CALCRIM No. 852A because that language increased the likelihood that the instruction erroneously directed the jury to conclude that appellant "did commit" at least the assault count based on her prior acts of domestic violence, under a mere preponderance of the evidence standard.

This language has been criticized by *People v. James* (2000) 81 Cal.App.4th 1343, 1357, fn. 8, and, to a lesser extent, by *People v. Frazier* (2001) 89 Cal.App.4th 30, 36. The California Supreme Court, however, has rejected a similar challenge, explaining that the problem with this argument "is that the instruction nowhere tells the jury it may rest a conviction solely on evidence of prior offenses. Indeed, the instruction's *next sentence* says quite the opposite: 'if you find by a preponderance of the evidence that the defendant committed a prior sexual offense . . . , that is not sufficient by itself to prove beyond a

28

reasonable doubt that he committed the charged crime.' " (*People v. Reliford* (2003) 29 Cal.4th 1007, 1013.) CALCRIM No. 852A similarly told the jury in this case: "If you conclude that the defendant committed the uncharged domestic violence, that conclusion is only one factor to consider along with all the other evidence. It is not sufficient by itself to prove that the defendant is guilty of Count 2. The People must still prove the charge beyond a reasonable doubt."

VI.    *There Is No Cumulative Prejudicial Error.*

Appellant contends that even if the errors considered separately are not prejudicial, they are when considered cumulatively. We see little to cumulate. Appellant relies heavily on what she contends was the erroneous admission of the prior acts of domestic violence to show prejudice. We have found no error in that ruling, and so we do not consider it cumulatively with the CALCRIM 852A error.

Appellant also relies on her claim that the evidence to support a robbery conviction was weak because the evidence as to whether Freddy even had a phone was weak. We find the evidence strong. Pelen, who generally testified favorably to appellant, testified that appellant returned to the truck with a phone which she said was Freddy's. Appellant does not suggest why Pelen would lie on this point. There is nothing of note to cumulate with the CALCRIM 852A instructional error.

**DISPOSITION**

The judgment of conviction is affirmed.

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

                                        STRATTON, P. J.

We concur:


GRIMES, J.


WILEY, J.